```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
3    -----------------------------------------------------------
                                  )
4    UNITED STATES OF AMERICA,     )   File No. 21-cr-192
                                  )               (JRT/BRT)
         Plaintiff,               )
5                                 )
     vs.                          )   Minneapolis, Minnesota
6                                 )   February 25, 2022
     JEROME LEE SWANSON,          )   12:30 p.m.
7                                 )
         Defendant.               )
8    -----------------------------------------------------------
9
              BEFORE THE HONORABLE BECKY R. THORSON
10         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                        (MOTIONS HEARING)
11
     APPEARANCES
12    For the Plaintiff:        UNITED STATES ATTORNEY
                                DAVID P. STEINKAMP, AUSA
13                              300 South Fourth Street
                                Suite 600
14                              Minneapolis, Minnesota 55415

15    For the Defendant:        OFFICE OF THE FEDERAL DEFENDER
                                DOUGLAS MICKO, ESQ.
16                              300 South Fourth Street
                                Suite 107
17                              Minneapolis, Minnesota
                                55415-1329
18
     Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
19                             Suite 146 U.S. Courthouse
                               316 North Robert Street
20                             Saint Paul, Minnesota 55101

21

22

23

24       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3
4          THE COURT:  This is the United States District

5     Court for the District of Minnesota and we're here for a

6     motions hearing in the matter entitled United States of

7     America versus Jerome Lee Swanson.  This is case number

8     21-CR-192 (JRT/BRT).

9          I'm Magistrate Judge Thorson and just -- I will be

10    keeping my mask on but what I'll do before we start here is

11    I'll take off my mask so you can see my whole face for a few

12    seconds there.

13         Now, we're all wearing masks and we're socially

14    distanced today, even though we're in person, because of the

15    COVID-19 pandemic so I just want to -- I will be covering a

16    few ground rules when we proceed here after the appearance

17    of counsel.  So let's start with appearances.  And I know

18    that when we had really high infection rates I was asking

19    everyone to remain seated when they are speaking.  I think

20    I'm very comfortable, especially given the space in this

21    courtroom, if the attorneys would like to stand, they

22    certainly may do so.  So if you're more comfortable

23    remaining seated, I won't take it the wrong way.

24         So let's start out with the Government and get the

25    Government's counsel appearance on the record.

1          MR. STEINKAMP:  Good afternoon, Your Honor.  David

2     Steinkamp on behalf of the Government.  And I find that

3     standing works better for the Court because you know who is

4     talking.  Sometimes it's hard to know who is talking with

5     all the masks on.  But I will be standing.  Thank you.

6          THE COURT:  All right.  Thank you.

7          And for the Defendant?

8          MR. MICKO:  Hello, Your Honor.  Doug Micko on

9     behalf of Jerome Swanson who is standing next to me at

10    counsel table.

11         THE COURT:  All right.  Good to see you and,

12    Mr. Swanson, good to see you.

13         All right.  Just a couple of things.  I will ask

14    the lawyers to keep their masks on and just speak up.  We

15    have a court reporter here and I don't think the lawyers

16    will have a problem with that but we just want to make it

17    easy for the court reporter to get down every -- every word,

18    and so I will just ask you to do that, and standing as you

19    did is perfectly fine.

20         We do have the lectern here for when the lawyers

21    are presenting to the Court or if there's examination,

22    cross-examination of witnesses, so you may step up to that

23    podium as well.

24         Now, I have both dispositive and non-dispositive

25    motions on the calendar here -- and I'm switching between

1    glasses because I have a computer pair and I have a pair

2    that is for distance here, so another result of COVID.  And

3    so looking at my computer screen, I will begin with the non-

4    dispositive motions that are on calendar today.

5            The Government's discovery motion I have at docket

6    number 31.  And what I'll do is ask Mr. Micko, does the

7    defendant have objections to the Government's discovery

8    motion?

9            MR. MICKO:  No objection, Your Honor.

10           THE COURT:  Thank you.

11           MR. STEINKAMP:  Your Honor, may I ask for a

12   clarification on one of my motions, if I may?

13           THE COURT:  Clarification?

14           MR. STEINKAMP:  May I ask for clarification on a

15   date for one of my motions?

16           THE COURT:  You may.

17           MR. STEINKAMP:  I would like the Court to inquire

18   or order when I would receive the alibi notice that is

19   required under my discovery motion.  So I didn't know if

20   Mr. Micko has an idea of that.  I'm willing to be flexible.

21   I just wanted to get some sort of timeframe.

22           THE COURT:  Mr. Micko, do you have a timeframe

23   that you would like to offer or another position?

24           MR. MICKO:  Your Honor, I don't have a strong

25   feeling on that, Your Honor.  You know, without being

1    presumptuous, it seems like we will probably have post-

2    hearing briefing in this matter and there will be some time

3    before trial.  Maybe seven days for an alibi notice would be

4    appropriate.

5            MR. STEINKAMP:  I was asking for more like 30

6    because the Government will have to investigate the alibi.

7    Once we hear about it, we will need a little time.

8            THE COURT:  Thirty days from what?

9            MR. STEINKAMP:  From the actual trial date.

10           MR. MICKO:  I think that's fine.  I was suggesting

11   seven days after the Court were to determine any outstanding

12   motions.

13           MR. STEINKAMP:  I'm sorry.  I misunderstood.

14           THE COURT:  All right.  Well, then why don't we

15   set it 30 days before trial.  And if that's the

16   clarification, is that acceptable?

17           MR. STEINKAMP:  That is, Your Honor.  Thank you.

18           THE COURT:  Mr. Micko?

19           MR. MICKO:  Yes, Your Honor.

20           THE COURT:  Thank you.  Good.

21           Well, let's then move on to the defendant's

22   motions; and I have a 404(b) motion at 17; a Brady motion at

23   18 -- docket 18, I should say; a discovery motion, I should

24   say, at docket 19; a Jencks Act motion at docket 22; a rough

25   notes motion at docket 23; and a motion related to expert

1    disclosures at docket 24.

2         The Government's response is at docket number 32.

3    Mr. Micko, did I miss any non-dispositive motions?

4         MR. MICKO:  Your Honor, the only non-dispositive

5    motions the Court missed, I think, are at dockets 20 and 21

6    which are withdrawn as moot.

7         THE COURT:  Okay.  That's -- that confirms, I

8    guess, why I didn't include them.  So those are moot and are

9    they withdrawn then?

10        MR. MICKO:  Yes, Your Honor.

11        THE COURT:  All right.  Thank you.  And now the

12   Government's response is in the docket -- the response at

13   docket number 32.  And is the defendant satisfied with the

14   Government's responses, Mr. Micko?

15        MR. MICKO:  Your Honor, yes with two minor

16   exceptions.  The first is with respect to Jencks material,

17   it's a minor issue.  We had asked for 14 days before trial.

18   The Government, while indicating that their belief that we

19   don't have a right to pretrial Jencks material, has offered

20   five days.  We would request seven days just for the

21   necessity for trial preparation.

22        The other issue is a little bit more meaty and

23   this has to do essentially with a discovery issue.  I

24   believe that discovery, as I put in our declaration, is

25   complete with the exception of one thing and that is it's

1    our understanding there are tape recorded statements or a

2    statement, at least, from the victim in this case which have

3    not yet been produced.  The Government has offered to

4    produce those statements pursuant to a protective order that

5    would prohibit Mr. Swanson personally from retaining a copy

6    of that discovery, and it's our position that the discovery

7    should be turned over without the necessity for a protective

8    order.

9         I'm happy to go into it further, but I don't want

10   to misstate Mr. Steinkamp's position.  And if it was a

11   protective order issue, he would be the proponent anyway.

12   So I'm happy to lay out our position on it right now or I'm

13   happy to just respond to Mr. Steinkamp on that.

14        THE COURT:  Why don't we hear first from

15   Mr. Steinkamp and then you can respond to that and we'll see

16   if we need any further response.  Mr. Steinkamp.

17        MR. STEINKAMP:  Thank you, Your Honor.  I'll just

18   go up to the podium here.

19        THE COURT:  Thank you.

20        MR. STEINKAMP:  Your Honor, I want to give you a

21   little background into what type of recording we're talking

22   about here.  In this case the victim of a carjacking in

23   Minneapolis was -- not only was his car taken, but he was

24   shot in the hip area by the individual who stole the car.

25   He went to the hospital and during that encounter with

1    medical staff, also police were present and they had body

2    cams, and so they recorded that initial interaction between

3    the medical personnel and the victim.

4         During that encounter the victim relayed many

5    personal identification facts, not to mention the -- his

6    medical condition.  And there's -- there's a recording of

7    the doctors responding to him and so forth.

8         I certainly intend to provide that to the defense.

9    I'm not suggesting that we would never do that.  But I do

10   think -- here's where I think the Court should know that it

11   has a combination of two things.  There is potentially Brady

12   material from my review of that tape.  It's arguable, but I

13   want to err on the side of caution.  So there's potential

14   Brady.  And there's also -- this is also a classic Jencks

15   statement, so there's sort of balance here, I think.

16        In order to solve that dilemma, I have offered to

17   provide the recording to counsel under a protective order.

18   In other words, the order would include that it could be

19   viewed by counsel and it could be viewed by Mr. Swanson

20   in -- but it could not be given to Mr. Swanson in the jail

21   because it contains those identification facts.

22        And I don't -- I submit to the Court that's not

23   unreasonable.  I am trying to comply with discovery but I'm

24   also very aware that this individual has been -- was shot,

25   was traumatized, and that personal information should not be

1    available to the public.  In my experience these things are

2    often discussed and passed around in the jail and it's just

3    not appropriate here.  So thank you.

4           THE COURT:  Let me ask you this.  How long is the

5    video?

6           MR. STEINKAMP:  Boy, it's hard for me to recall.

7    I think it was like -- I'm going to estimate 45 minutes.

8    Don't hold me to it, but there's a lot more to it than --

9    whatever their possible Brady material is is just a couple

10   of statements.  The rest of it is all medical care of this

11   individual.  And it will be disclosed in due course, but

12   we're so far from a trial date right now that I don't see

13   the urgency and, as I said, I'm willing to give it over

14   under a protective order in the near future anyway.

15          THE COURT:  Thank you.

16          Mr. Micko.

17          MR. MICKO:  Your Honor, a couple of points on

18   that.  Number one, as the Court knows, part of the dilemma

19   of Brady material is I don't know what it is until it's

20   turned over.  So it -- assuming there's Brady material on

21   there, under Rule 5 it could have been turned over

22   immediately, one way or another, and we don't have it still.

23          With respect to whether there ought to be a

24   protective order, I think this issue came up before Judge

25   Schultz in another case that I have and in the context of

1    that case I learned, and can represent to the Court, that at

2    the Sherburne County Jail where Mr. Swanson is housed, that

3    any materials like this that are not hard copy materials,

4    either on a USB drive or a disc, those are retained with the

5    jail and they are given to a detainee for use when they want

6    to review it in the law library, the single law library.

7    And then when they are done, they return the materials.

8            So the notion that this is going to get out to the

9    public or it could be a problem or something like that, you

10   know, I'm not going to say it's a theoretical notion because

11   I know that that happens from time to time, but it seems to

12   me that those concerns are already mitigated by the jail.

13           THE COURT:  What if -- and I'm thinking out loud

14   here -- but what if you would receive the material.  I mean,

15   the point is is that we need to get this to you and to your

16   client.  But what if you would enter into a protective order

17   where you were able to receive it and you were able to view

18   it with Mr. Swanson, and then you could come to the Court,

19   having viewed it, and come up with a way, if you think there

20   should be any ongoing access to it, for us to outline what

21   it is?  But at least we're not stuck in briefing here,

22   further briefing of the issue, and we could get a protective

23   order.

24           And of course I'll make note, I'm making it now on

25   the record, that if then you come back and ask for some

1   amendment of that protective order, then you'll have the

2   benefit of having seen it, having talked to Mr. Swanson

3   about it, and that might at least get it in your hands

4   quickly.

5           MR. MICKO:  I think that's a fine compromise.  The

6   issues that we've had before with this are, as the Court

7   knows, you know, I'm still not allowed to go physically to

8   the Sherburne County Jail so I can't meet with Mr. Swanson

9   and physically in front of a computer go over this.  So

10  we're kind of -- we're kind of hostages to technology.

11          And I'm happy to try to do that.  In the past I've

12  had difficulties with that because of the computer streaming

13  at Sherburne County Jail.  It doesn't pick up video or audio

14  that's kind of broadcast through screen share on Zoom that

15  well, but we can certainly give it a try.  I mean, I'll

16  still say that in my view Mr. Swanson ought to have a right

17  to be able to review that material on his own and not just

18  be beholden to whenever I set up a Zoom with him and spend

19  45 minutes going through it.

20          THE COURT:  I understand the argument, and what

21  I'm trying to do here is get it to you and you could see it

22  and have the benefit of at least making the argument of why,

23  maybe there would be a segment of it that is really

24  important and there could be a version of it without

25  disclosing more of the private medical information.  And

1    then there could be some outline of the procedures at

2    Sherburne that will apply that will ensure that it's not

3    distributed.

4           So I -- counsel, Mr. Micko, I understand why you

5    need to review that with your client so I appreciate that,

6    but I'm just looking at a mechanism to at least let you look

7    at it and cover it with your client and then make the --

8    just present an amended protective order that would address

9    the victim's concerns about the highly personal information.

10          MR. MICKO:  That sounds fine, Your Honor.  That

11   seems like something that would strike a good compromise so

12   that we can get the material as soon as possible.

13          THE COURT:  All right.  Well, then I'll ask

14   Mr. Steinkamp to get a proposed protective order to

15   Mr. Micko for review.  I'll sign off on it.  And then again,

16   for the record, Mr. Micko, you are invited to approach the

17   Court with a proposed amended protective order once you're

18   able to see it and make an argument for why further access,

19   ongoing access might be necessary for Mr. Swanson.

20          MR. MICKO:  Thank you, Your Honor.

21          THE COURT:  Thank you.  Is that acceptable to you,

22   Mr. Steinkamp?

23          MR. STEINKAMP:  Yes, that's an excellent

24   compromise.  Thank you, Your Honor.

25          THE COURT:  All right.  So then any other issues

1    with respect to the Government's response to the defendant's

2    non-dispositive motions?

3              MR. MICKO:  No, Your Honor.

4              THE COURT:  Thank you.  All right.  Well, now I do

5    have the dispositive motions that are on calendar here, and

6    I have a motion to suppress eye witness statements; a motion

7    to suppress and at -- well, the statements is at docket 25.

8    The second motion to suppress is at docket 26.  And then I

9    have the third motion to suppress at docket number 27.  And

10   these are the defendant's motions.  Mr. Micko, is the

11   defendant maintaining his motions?

12             MR. MICKO:  Yes, Your Honor.

13             THE COURT:  All right.  Thank you.  And I do

14   understand that the Government is intending to present

15   witness testimony.

16             MR. STEINKAMP:  Yes, Your Honor.

17             THE COURT:  And tell me, you know, the

18   witnesses -- and I will be -- I assume the witnesses will be

19   sequestered; is that right?

20             MR. STEINKAMP:  They are, yes, Your Honor.

21             THE COURT:  All right.  And tell me which

22   witnesses correspond to each of the motions.

23             MR. STEINKAMP:  So the Government is going to

24   proceed in chronological order.  So the first thing that

25   happens is the arrest of Mr. Swanson, the search of the bag,

14

1    and then during that process statements are given.  So that

2    would be -- the first witness will be Deputy Mosiman from

3    Wright County who was there at the arrest scene.  The second

4    witness will be Andrew Emanuel who was there at the arrest

5    scene and seized the gun.  And then after that we will have

6    Special Agent Chad Edlund who will testify regarding the

7    lineup issue.

8          And then I will put Special Agent Chris Langert

9    on, who is my case agent, and he's here so I would

10   respectfully request the sequestration doesn't apply to him.

11   Pursuant to the rule, the case agent can be present.  And

12   then I'll just call him briefly for just a quick testimony,

13   which I have discussed with -- Mr. Micko knows what I'm --

14   where I'm going with that, so...

15         THE COURT:  All right.  Let's address the

16   witnesses first.  Thank you, Mr. Steinkamp.

17         Mr. Micko, do you have any objection to the

18   sequence of witnesses and to the case agent being present?

19         MR. MICKO:  No, that's fine, Your Honor.

20         THE COURT:  All right.  Thank you.

21         And then let's talk -- let's fast forward ahead

22   because we have an afternoon of witness testimony here so I

23   don't want to start yet.  We will have a break and I'll

24   leave it to the court reporter to signal when we should have

25   a break between witnesses here during the afternoon.

1       And then I assume that we'll want a briefing

2  schedule after that.  So I just want to get that and I'll

3  have my law clerk set up some time after -- she can hand me

4  a note here about what would be a good briefing schedule so

5  I have that ready to go at the end of the testimony.  And so

6  we'll get that briefing schedule in place and that will

7  depend upon the transcript being prepared.

8       And who will be ordering the transcript, just so I

9  don't have to take care of those details if we -- we're

10  getting close to the end of the day?

11       MR. STEINKAMP:  Generally one of us will order it

12  and we'll split the cost.  Is that acceptable?

13       MR. MICKO:  That's fine.

14       THE COURT:  So then you will take care of that and

15  I'll give you those dates for the briefing on the

16  dispositive motions here today.

17       All right.  So Mr. Steinkamp, are you ready to

18  call your first witness?

19       MR. STEINKAMP:  Not quite.  There's a couple of

20  things, housekeeping things, I wanted to talk about with the

21  Court.  I've got exhibits that I'd like to -- well, I would

22  just like to offer my Exhibits 1 through 4 at this time.  I

23  don't think there's any objection.

24       THE COURT:  Any objection, Exhibits 1 through 4?

25       MR. MICKO:  You know, Your Honor, I have no

1    objection to the Court's consideration or accepting Exhibits

2    1 through 4.  Let me just say that Exhibit 3 appears to be a

3    transcript prepared of the video that's I think on all of

4    our screens right now.  So let me just say to the extent

5    that there's any type of deviation between the transcript

6    and the video, the video is obviously the best evidence.

7            THE COURT:  That's a fair point.  And obviously

8    it's a prepared transcript from the video, but you're not

9    agreeing that everything is perfect in that transcript;

10   right?

11           MR. MICKO:  Yes, Your Honor.

12           MR. STEINKAMP:  I offer it with that in mind, Your

13   Honor.

14           THE COURT:  All right.  Thank you.  And I should

15   ask, does the Government agree that I can accept the

16   exhibits electronically?

17           MR. STEINKAMP:  Yes.  And I do want to make a

18   point about that.  I would hope -- when I checked your -- I

19   have one for you, the Court, I have a USB; and when I

20   checked it today, it was clear that the video was there but

21   not the audio.  I'm having that worked on right now, and

22   when I get a good copy I'll make sure to get that to you and

23   your chambers, Your Honor.  If that's okay with Mr. Micko?

24           THE COURT:  And will you give that same copy to

25   Mr. Micko?

1          MR. STEINKAMP:  He's got it and his worked

2     according to him.  His exhibits worked.

3          THE COURT:  All right.

4          MR. STEINKAMP:  The audio was fine.

5          THE COURT:  And so we -- the Court will get a new

6     USB with the complete set of documents; correct?

7          MR. STEINKAMP:  Exactly, yes.

8          THE COURT:  And Mr. Micko, do you have any

9     objection to me receiving Exhibits 1 through 4

10    electronically?

11         MR. MICKO:  No, Your Honor.  Thank you.

12         THE COURT:  And the plan to get me the copy, you

13    already have it, is fine with the defense?

14         MR. MICKO:  We got it to work so we're fine with

15    our copy; and whenever yours works that's fine with us, too.

16         THE COURT:  Thank you, Mr. Micko.  Thank you,

17    Mr. Steinkamp.  Anything further on exhibits?

18         MR. STEINKAMP:  Not on exhibits, Your Honor.

19    Thank you.

20         THE COURT:  And Mr. Micko, do you intend to offer

21    any exhibits?

22         MR. MICKO:  No, Your Honor.

23         THE COURT:  All right.  So Exhibits 1 through 4,

24    the Government's Exhibits 1 through 4, are admitted for the

25    record here.

1              MR. STEINKAMP:  Okay.  And may I proceed, Your

2     Honor?  Just one other thing.

3              THE COURT:  You may.

4              MR. STEINKAMP:  I know the Court's ruled, I made a

5     motion to try to get a little bit more clarification of the

6     motions, and I know the Court ruled against me in that.  But

7     for the record, I just want to make it clear that I just

8     have a continuing objection to the motions as they are now

9     because I, again, continue to believe they are just a bit

10    vague.  If they were a little clearer, I would know a little

11    bit more of what the issue was and how to hone the evidence.

12             But I know the Court's ruled.  I just wanted to

13    make that of record.  I will be ready, I have all my

14    witnesses ready, and we're ready to go so there's not going

15    to be any impediment.

16             THE COURT:  I recognize that you sometimes need to

17    preserve the record, and that's what you need to do and you

18    may do that.

19             MR. STEINKAMP:  Thank you, Your Honor.

20             THE COURT:  Is there any response, Mr. Micko, that

21    you'd like to put on the record given the Government's

22    making of the record?

23             MR. MICKO:  No, Your Honor.  This was briefed and

24    I think that's sufficient.

25             THE COURT:  All right.  Thank you.

1           And so then is the next step, Mr. Steinkamp, for

2     you to call your first witness?

3           MR. STEINKAMP:  Yes, Your Honor.  The Government

4     calls Deputy Matthew Mosiman.  And did you say if I could

5     take off my mask or would you rather I not?

6           THE COURT:  I am comfortable if you take off your

7     mask and if the witness takes off his mask, but let me check

8     with Mr. Micko and Mr. Micko's client.

9           MR. MICKO:  That's fine, Your Honor.

10           THE COURT:  All right.  And then the same ground

11     rules will apply for you, Mr. Micko.

12           All right.  I'll ask the witness to come up to the

13     witness box here.  And I do want to make sure -- I have not

14     been in this courtroom recently.  I want to make sure that,

15     Mr. Micko, you and your client have a view here to see the

16     witness.

17           THE DEFENDANT:  Yes, Your Honor.

18           MR. MICKO:  Yes, Your Honor, although could I just

19     ask one favor and see if that changes when the witness sits

20     down?

21           THE COURT:  You may be seated for a moment there,

22     Officer.

23           MR. MICKO:  Thank you, Your Honor.  Yes, that's

24     fine.

25           THE COURT:  All right.  Very good.  So if you

```
 1    could stand and raise your right hand.

 2              Do you swear in the testimony you're about to give

 3    to tell the truth, the whole truth, and nothing but the

 4    truth?

 5              MR. MOSIMAN:  Yes.

 6              THE COURT:  Thank you.  Please be seated.  Get

 7    situated right in front of that microphone.  You may take

 8    your mask off.  And I'd like you to state your full name for

 9    the record and spell both your first and last name.

10              THE WITNESS:  Matthew Henry Mosiman.

11    M-A-T-T-H-E-W; last name Mosiman, M-O-S-I-M-A-N.

12              THE COURT:  And Officer Mosiman, I am going to ask

13    you to speak up, even though it feels a little bit

14    unnatural, so that everyone can hear you.

15              THE WITNESS:  Okay.

16              THE COURT:  Counsel, you may proceed.

17              MR. STEINKAMP:  Thank you, Your Honor.

18                         (MATTHEW MOSIMAN)

19                        DIRECT EXAMINATION

20    BY MR. STEINKAMP:

21    Q.  Deputy Mosiman, where are you currently employed?

22    A.  With Wright County Sheriff's Office.

23    Q.  Okay.  And how long have you been with the Wright County

24    Sheriff's Department?

25    A.  A little over two years.
```

1    Q.   Okay.   What's your educational background?

2    A.   I have a bachelor's degree in criminal justice with

3    Winona State University.   Shortly after graduating college,

4    I went to a ten-week skills program at Alexandria Technical

5    College.

6    Q.   Okay.   And you said you're employed with the Wright

7    Country Sheriff's Office.   What are your duties there?

8    A.   A patrol deputy.

9    Q.   What's a patrol deputy do generally?

10   A.   We respond to 911 calls, any calls for service, and

11   generally do traffic patrol.

12   Q.   Okay.

13   A.   Enforcement.

14   Q.   And if you get a call on your radio that you need to go

15   somewhere, address an issue, a crime in progress, whatever,

16   you respond with -- to those radio directives; correct?

17   A.   Correct.

18   Q.   Okay.   Now, were you working on June 7th of 2021 in your

19   capacity as a deputy?

20   A.   I was.

21   Q.   And when did you start your shift that day?

22   A.   Noon.

23   Q.   Now, do you have a particular area of the county that

24   you concentrate in?

25   A.   Yes, when I was working on that date, I was working in

```
 1    Otsego.
 2    Q.  Okay.  Do you have other individuals that work that area
 3    with you, other deputies?
 4    A.  Yes, there were two other deputies working that area
 5    that day.
 6    Q.  Okay.  On that day were you dressed similar to what
 7    you're wearing today?  Were you wearing a uniform?
 8    A.  Yes.
 9    Q.  Were you driving a squad car?
10    A.  Yes.
11    Q.  Marked squad car?
12    A.  Yes.
13    Q.  All right.  So it's clearly on the side "Wright County
14    Deputy."  Correct?
15    A.  Correct.
16    Q.  Does that squad car have a video system in it?
17    A.  It does.
18    Q.  So it records video.  And how does it record video in
19    the squad?
20    A.  There is a camera hanging down from the top of the
21    inside of the squad car, um, facing out towards the dash.
22    So towards the hood of the vehicle.
23    Q.  So it's through the windshield?
24    A.  Yes.
25    Q.  So the view you would get on the camera is sort of the
```

1    view you would get if you were sitting in the front seat of

2    the vehicle; correct?

3    A.  Correct.

4    Q.  Do you have a -- did you have body cameras on June 7th?

5    A.  No.

6    Q.  And that's just your whole department doesn't have them

7    yet; is that correct?

8    A.  Correct.

9    Q.  All right.  And then before you came to the hearing, we

10   had a chance to review Government's Exhibit Number 2, the

11   video anyway that's in the exhibits.  I don't have my

12   exhibit list handy.  I don't know what I put on it.  Did you

13   see the -- did you see the exhibit that the Government

14   prepared for today's hearing of the squad video?

15   A.  Yes.

16   Q.  And did it -- did it -- does it match your recollection

17   of the scene back on June 7th?

18   A.  It does.

19   Q.  Okay.  So on June 7th, did you get a call to respond to

20   an area in Otsego at about 3:52 p.m.?

21   A.  Yes.

22   Q.  And what was the nature of that call?

23   A.  It was a call regarding a possible stolen vehicle out of

24   Minneapolis.

25   Q.  Okay.  And what more can you -- about that initial call,

1   what more can you say about it?

2   A.  The initial call said that the reporter, her vehicle was

3   stolen out of Minneapolis in a carjacking.

4   Q.  Okay.  Did you then follow up and contact the reporter

5   of the stolen car?

6   A.  I did.

7   Q.  Okay.  How did you do that?

8   A.  I called her by phone.

9   Q.  Okay.  And what did you learn when you called the

10  reporter of the stolen vehicle?

11  A.  She had said that her husband on Sunday, so the day

12  prior, had given a suspect, and she described him as a

13  mixed -- an unknown mixed black male, a ride in Minneapolis.

14  Q.  All right.  What else did she say?

15  A.  She had told me that during that time the suspect had

16  carjacked the vehicle at gunpoint and shot her husband in

17  the stomach.

18  Q.  Okay.  Did she say whether the individual took the

19  vehicle away?

20  A.  Yes, she said that once the suspect shot her husband in

21  the stomach, he took the vehicle away.  And she described

22  the vehicle as a 2005 gray Buick sedan or La Crosse, sorry.

23  And --

24  Q.  Okay.  Did she say whether the gun that was used to

25  shoot her husband had been recovered?

1    A.  Um, she didn't say that, but in the call details and our

2    call for service details on screen it said that the gun was

3    not recovered.

4    Q.  Okay.  So somebody had informed your dispatch of that at

5    some point?

6    A.  Yes.

7    Q.  Okay.  So armed with that information -- well, let me

8    ask you just a little bit more.  Did the reporter tell you

9    how or if she knew where the vehicle was located?

10   A.  Yes.  So she had told me she leases the vehicle through

11   CarHop.  She described it as CarHop has a system where they

12   can automatically shut off the vehicle and track the vehicle

13   as well.  And so when she reported it -- the day that she

14   was talking to me, she said she reported it around 10:00

15   that morning; and around 3:15 CarHop had informed her that

16   they shut off the vehicle and that the vehicle was tracking

17   at the address in the call, which was XX XXX XXXXX XXXXX in

18   Otsego.

19   Q.  Okay.  All right.  So armed with that information, did

20   you take action regarding the stolen vehicle?

21   A.  Yes.  I had contacted the other deputies, the two other

22   deputies working in my area, and we responded to XX XXX

23   XXXXX XXXXX where the car was described as being located at

24   or pinged at.

25   Q.  Okay.  When you arrived there, did you see the vehicle?

1  A.  Yes.  I saw the vehicle parked on the street in front of

2  XX XXX XXXXX XXXXX.

3  Q.  Okay.  And you positively identified it as the stolen

4  Buick; correct?

5  A.  Correct.  It had the same license plate on it that was

6  described.

7  Q.  All right.  Now, when you got out of your squad car, did

8  you encounter any people when they came out of the house at

9  XX XXX XXXXX XXXXX?

10  A.  Yes.  So there were two males standing in front of XX

11  XXX XXXXX XXXXX, and we had walked up to both these males.

12  One, I believe his name was David Heil, and the other, I

13  believe his name was Jeremy -- last name started with an O.

14  Q.  Okay.  And they were standing in the front yard?

15  A.  Correct.

16  Q.  All right.

17  A.  Or near the front yard.

18  Q.  What did you do next?

19  A.  We had asked them who was driving the vehicle that day

20  and David had said it was his brother, Thomas, who was

21  inside.

22  Q.  Okay.  And so what did you do then?

23  A.  Well, David had said that he could grab his brother,

24  contact his brother, go in there and grab his brother.  And

25  so we said okay.  And Jeremy, the other male on the scene,

1    seemed agitated and nervous.  He was sweating and he started

2    walking away.  And --

3    Q.  Can I ask you a question, a clarifying question so the

4    Court's clear?

5    A.  Yes.

6    Q.  When you say "Jeremy," you're not referring to the

7    defendant in this case, Jerome Swanson.  You're talking

8    about a third man, a different man named Jeremy whose last

9    name begins with O, just so we're clear?

10   A.  Correct.

11   Q.  Okay.  So this is a different individual?

12   A.  Yes.

13   Q.  All right.  Continue.

14   A.  And Jeremy was walking away, and we had asked him to

15   stay on scene so we could figure out who the vehicle

16   belonged to.  And he was still nervous.  He continued

17   walking away, and then he made comments -- he made a comment

18   saying he doesn't want to be caught in the crossfire.  And

19   so --

20   Q.  Did that phrase alarm you and why?

21   A.  Yes.  It alarmed me because when he said that phase, I

22   knew this vehicle was involved in a carjacking where someone

23   had been shot in the belly.  So me and my partners took

24   defensive positions behind my squad car parked in front of

25   XX XXX XXXXX XXXXX.

1    Q.   Okay.   What happened then?

2    A.   We took defensive positions; and I believe at that time

3    David Heil was inside the residence because he had said that

4    he was going to get Thomas, Thomas Jackson, his brother, and

5    he returned outside without anyone with him.   So he was

6    alone when he returned outside.   And he said -- he had told

7    me when I was behind the squad car he had said that

8    Jerome -- he could not find Jerome inside.   And this is the

9    first time I had heard of the name Jerome.

10   Q.   Okay.   Now you later learned that his brother was Jerome

11   Swanson, his half brother; correct?

12   A.   Correct.

13   Q.   And do you see Mr. Swanson in the courtroom here today?

14   A.   I do.

15   Q.   Could you just identify what he's wearing for the

16   record?

17   A.   An orange sweatshirt.

18   Q.   Okay.   Is his hair in a different condition as it was on

19   the day of June 7th?   Of June 7th is his hair different is

20   what I'm trying to get it.

21   A.   Can you repeat that?

22   Q.   Is his hair in a different condition than it was on June

23   7th?

24   A.   I believe it was the same.   I don't --

25   Q.   You don't recall?

1    A.  -- recall.

2    Q.  Okay.  That's fine.  Did you learn later -- just so the

3    Judge is clear -- did you learn later that both Jerome

4    Swanson and Thomas Jackson are brothers of David Heil?

5    A.  Yes.

6    Q.  Now, at this point do you have anybody in custody

7    regarding -- let me strike that.

8           Did you receive additional information about who

9    drove the Buick to the scene?

10   A.  Yes.  Once David had exited without anyone with him, I

11   asked him where Thomas was.  He had told me that he didn't

12   know.  He wanted me to get Thomas, and thought it was

13   Jerome.  He said he couldn't find Jerome and he believed

14   Jerome Swanson had fled out the back of the residence.

15          David -- during that time, David had told me

16   Jerome Swanson was the driver of the vehicle and Thomas

17   Jackson was the passenger, and they both arrived in the

18   vehicle.

19   Q.  Okay.  But at this point you don't have -- Mr. Swanson

20   is not on the scene; correct?

21   A.  Correct.

22   Q.  Is Mr. Jackson on the scene?

23   A.  David Heil had told me that Thomas Jackson was still

24   inside the residence at that time.

25   Q.  Okay.  So what happened with Thomas Jackson?

1    A.  So when we received that information, deputies on scene,

2    my two partners that were working with me set up a perimeter

3    around the residence and our Special Investigations Unit was

4    dispatched along with my supervisors and a K9 Unit because

5    of the information that we got from David that Jerome

6    Swanson had possibly fled the scene.

7    Q.  Okay.  I'm sorry.  So you set up a perimeter.  You

8    brought in additional people.  At that time was Jerome

9    Swanson located?

10   A.  Yes.  David was asked to go back inside and retrieve --

11   Q.  I said Jerome Swanson.

12   A.  I'm sorry.  No, Jerome Swanson was not located.

13   Q.  Was Thomas Jackson located?

14   A.  Yes, Thomas Jackson was located.  David was asked to go

15   inside and take his brother outside, which he did; and

16   Thomas Jackson was then arrested.

17   Q.  For possession of stolen property?

18   A.  Correct.

19   Q.  Okay.  Now, at some point did you attempt to get a

20   photograph and other information about Jerome Swanson?

21   A.  Yes.

22   Q.  What did you do?

23   A.  I looked at our statewide system, which I will type in a

24   name and a date of birth and it will display information of

25   that person like it would on a driver's license, as well as

1    a driver's license photograph of that person.

2    Q.  Okay.  And so you got one of those photographs?

3    A.  Correct.

4    Q.  Did you show it to the brother, David?

5    A.  Yes.

6    Q.  What was the response?

7    A.  And he had told me it was Jerome Swanson.

8    Q.  Okay.  So now you've got a picture of Jerome Swanson.

9    Did you do further checking to determine whether he had any

10   warrants?

11   A.  Yes.  I found out through our -- our system, we call it

12   NCIC, that Jerome Swanson had a felony theft from vehicle

13   warrant -- or sorry, felony theft of vehicle warrant out of

14   Anoka County.

15   Q.  Okay.  And that wasn't related to your ongoing motor

16   vehicle theft investigation that day.  That was a prior

17   incident?

18   A.  Yes.

19   Q.  Did you verify that through your dispatch?

20   A.  Yes.  It was eventually verified.

21   Q.  All right.  Did you stay on scene and make sure the

22   vehicle was processed and towed away and that kind of thing?

23   A.  Yes.

24   Q.  And then did you leave?

25   A.  Yes, after he was -- Jerome Swanson was positively ID'd,

```
1    we all cleared the scene.

2    Q.  Okay.  So at this point Jerome Swanson is not found.

3    You're still on duty in your -- as a deputy; correct?

4    A.  Correct.

5    Q.  And did you receive a call about 8:30 on the evening of

6    June 7th, so just later in the evening on the same day?

7    A.  Yeah.

8    Q.  Okay.

9    A.  That sounds --

10   Q.  Can you describe that?

11   A.  That sounds right.  Dispatch had --

12   Q.  What sounds right?  I'm sorry.  I want to be clear.

13   A.  The time.

14   Q.  Do you need to refresh your memory on the time?

15   A.  I do.

16          MR. STEINKAMP:  May he review his report and

17   refresh his memory on just the time, Your Honor?

18          THE COURT:  Any objection, Mr. Micko?

19          MR. MICKO:  No objection, Your Honor.

20          THE COURT:  All right.  You may.

21          THE WITNESS:  So you had said 8:30.  I believe it

22   was around 8:03.

23          MR. STEINKAMP:  Okay.  That could have been my

24   mistake.  I apologize.

25   BY MR. STEINKAMP:
```

1    Q.  So 8:03 p.m. on June 7th?

2    A.  Yes.

3    Q.  And can you just describe the nature of the call?

4    A.  Dispatch had reactivated the call and stated that --

5    advised me that David Heil was on the line and he wanted to

6    speak to a deputy because Jerome Swanson was with him.

7    Q.  Okay.  And then did you speak with Jerome Swanson?

8    A.  Yes.  I called David Heil by phone, who handed the phone

9    to Jerome Swanson.  I was able to talk to Jerome Swanson by

10   phone.

11   Q.  Okay.  So after that discussion, did you then take

12   action to go locate Jerome Swanson?

13   A.  Yes.

14   Q.  What did you do?

15   A.  Myself and another deputy, who was just getting into

16   work, had accompanied me over to XX XXX XXXXX XXXXX where

17   Jerome and David and I believe David's girlfriend was

18   sitting outside.

19   Q.  Okay.

20   A.  Or in front of the residence.

21   Q.  All right.  And you pulled up to the residence in your

22   squad car; correct?

23   A.  Correct.

24   Q.  And you have a squad video of that incident; correct?

25   A.  Correct.

1    Q.  All right.

2              MR. STEINKAMP:  Your Honor, can I just confer with

3    counsel about one thing that I should have done before we

4    got going here?  Is that okay?

5              THE COURT:  You may.

6              (Discussion held off the record.)

7              MR. STEINKAMP:  So, Your Honor, we had stipulated

8    regarding some of the statements that are being challenged

9    here and are being considered by the Court today so I want

10   to make that on the record.

11             There are statements by Mr. Swanson before 28:06

12   on the counter on this video.  However, the defense is not

13   trying to suppress them.  They were -- he called the

14   officer.  So it's not -- those are not within the defense's

15   motion, is my understanding.

16             The Government, for its part, is only concerned

17   with the statements from 28:06 on this video to 54:30.

18   54:30.  There are statements after that but the Government

19   is not seeking to offer them at trial so we're really only

20   focusing in on 28:06 to 54:30.  And the way the Court --

21   that will also be known from Government's Exhibit 3, which

22   is the transcript in this case.  That's where it starts and

23   that's where it ends.  So I just want to make that clear so

24   you have that.  Am I not being clear on that, Your Honor, or

25   do you have that?

1          THE COURT:  You're clear and I'll just mention,

2     again, that the transcript at Exhibit 3 is not -- defense is

3     not accepting that as the accurate transcript, but I

4     understand the point you're making.

5          I think it will be important when you brief this

6     to make it clear which statements, Mr. Micko, you're trying

7     to suppress.  I understand the wisdom in making it clear for

8     the hearing, but I would like that to be confirmed with the

9     follow-up briefing.  Mr. Micko?

10          MR. MICKO:  Yes, Your Honor.  That makes perfect

11     sense.  We will do so.

12          Just to further clarify it here, as the deputy is

13     testifying, there were some statements that were made during

14     a telephone call before a physical encounter with

15     Mr. Swanson, and those aren't subject to the challenge.  I

16     believe that's what Mr. Steinkamp was talking about and the

17     ones that precede 28:06.

18          THE COURT:  Yeah.  And it's a very helpful

19     clarification from counsel for both sides.  I understand and

20     then my concern is just making sure that the written

21     submission makes that clear.

22          MR. STEINKAMP:  Okay.

23          THE COURT:  All right?

24          MR. STEINKAMP:  Yes, Your Honor.  Do you have a

25     copy of the transcript because it's kind of helpful to

1    follow along.

2             THE COURT:  I do have the transcript so let me

3    pull that up.

4             MR. STEINKAMP:  And just so we're clear, too, the

5    video that I have provided you and counsel is clipped and it

6    only includes those portions.

7             THE COURT:  Okay.  I see.

8             MR. STEINKAMP:  There's a little bit more at the

9    end, but it's nonconsequential really.

10            THE COURT:  Let me get adjusted here so that I can

11   look at the witness and looking at the transcript.  So I do

12   have Exhibit Number 3 in front of me.

13            MR. STEINKAMP:  Okay.

14   BY MR. STEINKAMP:

15   Q.  Deputy Mosiman, do you see a screen in front of you

16   that's depicting a windshield looking out at a street?

17   A.  Yes.

18   Q.  Okay.  So that is approximately the time that you --

19   well, that is the time that you arrived out at XX XXX XXXXX

20   XXXXX, correct?  That's what it looked like when you arrived

21   there?

22   A.  Yes.

23   Q.  All right.  And this is set at 28:06.

24            MR. STEINKAMP:  So I'm going to begin playing this

25   Exhibit and I may at times stop, Your Honor, and just

1    question the witness about what's going on in the video.

2              THE COURT:  And just so the record is clear, the

3    witness is reviewing which exhibit number?

4              MR. STEINKAMP:  I don't have that exhibit list.

5    Is it 2?  Thank you.  It's Government Exhibit 2, the video,

6    Your Honor.

7              THE COURT:  All right.  And then you've asked me

8    to call up Government Exhibit 3 just to assist here today;

9    correct?

10             MR. STEINKAMP:  Correct.

11             THE COURT:  Thank you.

12             MR. STEINKAMP:  And you can see I'm playing

13   Government's 2 off of my computer because we're having some

14   sound issues, but you can see that okay, Your Honor?

15             THE COURT:  I can see it here.  I do -- this other

16   screen is in the way of me viewing the witness so I do see

17   it here and I have a good access to that.

18             MR. STEINKAMP:  Okay.

19             THE COURT:  Mr. Micko, any objection to proceeding

20   in this fashion?

21             MR. MICKO:  No, Your Honor.

22             THE COURT:  Okay.  Thank you.

23             Mr. Steinkamp, you can proceed.

24             MR. STEINKAMP:  Okay.  I'm going to begin playing

25   Government's Exhibit 2 at 28:06 on the counter.

```
 1                    (Video exhibit played.)

 2    BY MR. STEINKAMP:

 3    Q.  Just for the record, Deputy, that's you.  You got a

 4    baseball cap on, walking in front of your squad car;

 5    correct?

 6    A.  Yes.

 7    Q.  At 28:18.

 8                    (Video Exhibit played.)

 9    BY MR. STEINKAMP:

10    Q.  So, Deputy, at this point, we stopped it at 29:36, at

11    this point what's going on between you and Mr. Swanson?

12    A.  Um, I went up there, spoke with him for a brief moment

13    and asked to search him and searched him.

14    Q.  You asked him if you could pat him down or frisk him and

15    search him and he said yes?

16    A.  Yes.

17    Q.  Okay.  One thing I do want to do for the record, and

18    just make this clear.  So the Court's comment, you did

19    review this transcript and, to the best of your ability, it

20    accurately reflects what's on the tape; correct?

21    A.  Correct.

22    Q.  I mean, we're not suggesting it's verbatim but you did

23    have a chance to look it over and you feel it's accurate;

24    correct?

25    A.  Yes.
```

1    Q.  And also, just so we're clear, we've indicated each

2    speaker by initial.  MM is you; JS is Mr. Swanson.  Deputy

3    Andrew Emanuel was there with you at the scene; correct?

4    A.  Correct.

5    Q.  And that's AE.  And DH is David Heil.  There's an

6    unknown female, and there's another unknown individual,

7    correct, listed in the transcript?

8    A.  I only know of the unknown female.

9    Q.  Okay.  But my point is that's -- the way that they are

10   notated here is correct based on your review of the video

11   and the transcript?

12   A.  Yes, based off of my review.

13           MR. STEINKAMP:  Okay.  Thanks.  Okay.  Let's

14   continue at 29:36.

15           (Video exhibit played.)

16   BY MR. STEINKAMP:

17   Q.  All right.  Deputy, at about 30:15 on the video, do you

18   hear some clicking going on?  Did you hear that on the

19   video?  Were you able to hear that?

20   A.  The audio wasn't great on my end.

21   Q.  Well, I can -- if that's the problem, we're over a

22   speaker here but let me replay it and let me just see.

23           But in any event, around that time do you recall

24   that's when you put the handcuffs on Mr. Swanson?

25   A.  Correct.

1    Q.  And you do remember listening to the video where there

2    was clicking where that happened; correct?

3    A.  Yes.

4    Q.  Okay.  So at this point Mr. Swanson's probably

5    handcuffed, is that correct, or soon after?

6    A.  Yeah, around that time.

7    Q.  All right.  I'm going to continue playing at 30:26.

8              (Video exhibit played.)

9    BY MR. STEINKAMP:

10   Q.  I'm going to go back here just a bit, Deputy Mosiman.

11             MR. STEINKAMP:  Your Honor, are you able to hear?

12   I need to take a short recess here and ask you because for

13   some reason the audio doesn't work in the courtroom so I'm

14   trying to mic it.  Are you able to hear any of this audio or

15   not?

16             THE COURT:  I can make some of it out, but it

17   is -- I don't know if the other audio will be better.  I'm

18   looking at this Exhibit 3 knowing that it may not be

19   perfect.

20             MR. STEINKAMP:  So you're following along?

21             THE COURT:  I'm following along.

22             MR. STEINKAMP:  Yeah, it's unfortunate because the

23   audio is quite good when it's directly through the system

24   and you're right, the Court's IT people and my IT people

25   couldn't figure it out so I guess we'll just have to

1    endeavor on here.

2    BY MR. STEINKAMP:

3    Q.  I do want to go back just a bit here, Deputy, and please

4    this at 29:38.

5              (Video exhibit played.)

6    BY MR. STEINKAMP:

7    Q.  At that point, Deputy, did you actually give him a

8    cigarette, put it in his mouth?

9    A.  Yes.

10             (Video exhibit played.)

11   BY MR. STEINKAMP:

12   Q.  All right.  Did you hear the individual in the

13   background say "his belongings"?  Did you hear that or do

14   you have the transcript handy?

15   A.  I don't have the transcript handy.

16             MR. STEINKAMP:  May I approach, Your Honor, and

17   give him a copy of the transcript?

18             THE COURT:  You may.  I'm able to hear that.

19   You're not able to hear, Deputy?

20             THE WITNESS:  Around what time in the video was

21   that?

22             MR. STEINKAMP:  Here.  It will be much easier if

23   you're looking at this.  Let me play it again.

24             THE COURT:  And I'm not sure if there's any way to

25   turn up the volume on the speaker.

```
 1              MR. STEINKAMP:  I turned it up as highest as I can

 2      get it on my computer.  You may be able to turn it up on

 3      your end.  I'm not sure if you can.

 4              THE COURT:  I don't think I have individual

 5      speaker controls there.

 6              MR. STEINKAMP:  Okay.  Well, this would be on

 7      the -- I'm going to refer you to the second page of the

 8      transcript near the bottom, Deputy.  That's about where

 9      we're at.  I'm going to go back just a little bit.

10              We're starting at 30:17.  Should I proceed, Your

11      Honor?

12              THE COURT:  You may proceed.

13              (Video exhibit played.)

14      BY MR. STEINKAMP:

15      Q.  All right.  Do you hear that where an individual said

16      "his belongings" or something like that?

17      A.  Yes.

18      Q.  Okay.  Do you remember who that was?

19      A.  David Heil.

20      Q.  Do you remember what was happening then?  I mean, can

21      you describe what was happening then?

22      A.  From what I remember, David Heil was coming out of the

23      residence with Jerome's belongings.

24      Q.  Okay.  And soon after he said "his belongings," we'll

25      play at 30:37.
```

```
 1                    (Video exhibit played.)
 2    BY MR. STEINKAMP:
 3    Q.  All right.  So you're present when those words were
 4    spoken.  What was significant to you about that?
 5    A.  There was a firearm in the bag.
 6    Q.  In which bag?  One of the bags?
 7    A.  In one of the bags that David had brought out.
 8    Q.  Okay.  And what was significant to you about that?  Why
 9    was that concerning?
10    A.  It was concerning because during that call there was a
11    vehicle, the day prior, involved in a carjacking where a
12    victim was shot in the stomach.
13    Q.  Okay.  And what -- the fact that there was a firearm
14    that's uncontrolled by law enforcement in that situation,
15    what concerns does that create for you?
16    A.  A lot of concerns.  There's a list of concerns when
17    there's an unknown firearm on the scene.  I mean, we don't
18    know what type of firearm it is.  What type of ammo.  If the
19    firearm is in good working condition.  If it's not, where
20    it's placed.  If it's in a secure position in the bag.
21    Q.  All right.  What concerns do you have about a gun in
22    that situation when there's other individuals present beside
23    law enforcement?
24    A.  There's always a level of concern when there's a firearm
25    brought into a situation when there are people that we don't
```

1    know around it.

2    Q.  Okay.  Did you know Mr. Swanson?

3    A.  No.

4    Q.  But you knew that he was a suspect in a carjacking?

5    A.  Correct.

6    Q.  With a gun?

7    A.  Correct.

8    Q.  In your experience, is it possible for individuals that

9    are handcuffed to acquire weapons in that situation?

10   A.  It's a lot more difficult, but you can still move and

11   grab things in a handcuffed position.

12   Q.  And he wasn't -- at the time that David Heil brought out

13   the bag and said there's a firearm in there, Mr. Swanson was

14   standing there; correct?

15   A.  Correct.

16   Q.  How far from the area where the gun was was Mr. Swanson,

17   approximately?

18   A.  Approximately five to seven feet.

19   Q.  Okay.  And was there another officer on scene --

20   A.  Correct.

21   Q.  -- with you?  Who was that?

22   A.  Deputy Emanuel.

23   Q.  Okay.  The other individuals that were David Heil and

24   the female, were they in proximity to where the gun was

25   located?

```
 1    A.  Yes.

 2    Q.  Do they create concerns for you in that situation in

 3    regard to the gun?

 4    A.  Yes.  There's always a concern when there's people that

 5    we don't know and an unsecured firearm in the location or in

 6    the vicinity.

 7    Q.  What's the concern?

 8    A.  That someone may grab the gun and use it against us.

 9    Shoot us.  Like I said before, there was a shooting the day

10    prior with a vehicle that was involved in this case, so

11    we're unsure if the gun was linked to that or not.

12    Q.  Okay.  And earlier on this day did you receive

13    information that even added to that concern that that gun

14    could be used?

15    A.  I'm sorry.  Repeat the question.

16    Q.  Earlier in the day when you went to the scene at -- at

17    about 3:30 that day, when you went there, was there other

18    information that came out there that even would have given

19    you additional concern?  Did somebody refer to the fact that

20    they didn't want to --

21              MR. MICKO:  Objection, leading.

22              THE COURT:  Sustained.

23    BY MR. STEINKAMP:

24    Q.  What did Mr. Jeremy O say at that time that would have

25    possibly added to your concern?
```

1    A.  He had said, "I don't want to get caught in the

2    crossfire."  Something along those lines.

3    Q.  Okay.  So that had already happened as well; correct?

4    A.  Correct.

5    Q.  In that situation, do you want to secure the firearm?

6    A.  Yes.

7    Q.  In the situation you have just described here?

8    A.  Correct.

9    Q.  And you want to do that for your safety, correct, and

10   the safety of others?

11   A.  Correct.

12   Q.  All right.  Let's continue playing at 30:42.

13              (Video exhibit played.)

14   BY MR. STEINKAMP:

15   Q.  All right.  I stopped at 31:48.

16              Mr. Swanson just said something to you like, "Are

17   we going to do the conversating here?"  Correct?

18   A.  Correct.

19   Q.  What did you take that to mean?

20   A.  If we were going to talk about what had just happened

21   that day.

22   Q.  "Conversating" meaning talking?

23   A.  Yes.

24   Q.  And you said no; right?

25   A.  Yes.

1    Q.  In fact, you never interrogated the defendant during the

2    entire time you were with him?

3              MR. MICKO:  Objection.  Calls for a legal

4    conclusion.

5              THE COURT:  Overruled.

6              MR. STEINKAMP:  I will be even more clear, Your

7    Honor.

8    BY MR. STEINKAMP:

9    Q.  Did you ever ask a question of the defendant regarding

10   the underlying offenses, either theft of the vehicle,

11   possession and use of the gun, anything connected to the

12   carjacking?

13   A.  No.

14   Q.  In fact, you just -- he asked you a lot of questions;

15   correct?

16   A.  Correct.

17   Q.  All right.  And I guess we'll see that as we continue

18   through the video.  But you literally told him

19   affirmatively, "I'm not going to be talking to you."

20   Correct?

21   A.  Correct.

22   Q.  Was that your intention?

23   A.  To not talk to him?

24   Q.  To not have the conversation with him, interrogate him

25   about the crime?

```
1    A.  Yes, that was my intention.

2    Q.  What was going to happen in terms of the investigative

3    process?

4    A.  I was going to take him to jail and -- what do you mean

5    by that?

6    Q.  Well, if you're not going to be the one to talk to him,

7    did you have an idea that somebody else would be talking to

8    him about that crime if it wasn't you?

9    A.  Yes.

10   Q.  And who would that be?

11   A.  An investigator, either with our department or

12   Minneapolis's department.

13   Q.  Because you knew this event originated in Minneapolis?

14   A.  Yes.

15   Q.  And you knew the investigation was ongoing?

16   A.  Yes.

17   Q.  Okay.  All right.  Let's continue at 31:48.

18           (Video exhibit played.)

19   BY MR. STEINKAMP:

20   Q.  All right.  At that point Jerome Swanson says his

21   fingerprints are going to be on it.  "I don't know about any

22   of those bullets.  My fingerprints of course are all over it

23   because of course I was looking at it."  Before that

24   statement, you did not ask him a question; correct?

25   A.  Correct.
```

1    Q.  In fact, before that you explained to him that he would

2    be talking to someone else, not you; correct?

3    A.  I mentioned that, yes.

4    Q.  Well, you said:  "You will be doing it with someone

5    else."  What were you talking about there?

6    A.  I believed, like I said before, an investigator or

7    detective would question him.

8    Q.  You were talking about his statement; correct?

9    Mr. Swanson's statement to another officer.  "You will be

10   doing it with someone else."

11   A.  Correct.

12   Q.  Okay.

13            MR. STEINKAMP:  We'll continue on at 33:07.

14            (Video exhibit played.)

15   BY MR. STEINKAMP:

16   Q.  So at that point Mr. Swanson said, "If you all could

17   just search that."  Correct?

18   A.  Correct.

19   Q.  And what is "that" that he is talking about?  What's

20   sitting there that is the subject of that discussion?

21   A.  I believe there was a bag with his belongings.

22   Q.  Okay.  And the bag, was there ultimately a bag found

23   there with a gun in it?

24   A.  Yes.

25   Q.  There was two bags, correct, or do you recall?

1    A.  I recall there being two bags.

2    Q.  Okay.  But he says, "If you all could just search that."

3    He's referencing those bags, in your mind?

4              MR. MICKO:  Objection.  Misstates the exhibit.

5              THE COURT:  I will sustain the objection.  It's

6    just not clear what we're talking about here, too.

7              MR. STEINKAMP:  Okay.

8              THE COURT:  So if you could just make this a

9    little bit clearer.  And if you're referring to the

10   officer's recollections, let's make that clear.  Or if we're

11   talking about the exhibit, let's make that clear.

12             MR. STEINKAMP:  Oh, I'm sorry.

13   BY MR. STEINKAMP:

14   Q.  Deputy, when Mr. Swanson says you all -- do you see on

15   the transcript, Government Exhibit 3, do you see where JS

16   says:  "If I could, you all could just search that.  If I

17   could just leave that with him because those are my clothes.

18   Just my clothes."  Do you see that line?

19   A.  Yes.

20   Q.  Okay.  And you heard it on -- did you hear it on the

21   video him saying that?

22   A.  I did.

23   Q.  Okay.  So when he says "search that," what -- since you

24   were there, what was Mr. Swanson referring to at the scene

25   when he said that?

CARLA R. BEBAULT, RMR, CRR, FCRR

1    A.  The bag with his clothes in it.

2    Q.  Okay.  We'll continue on at 33:29.

3            (Video exhibit played.)

4            MR. STEINKAMP:  All right.  I'm going to stop the

5    video at 34:48.

6    BY MR. STEINKAMP:

7    Q.  At this point, Deputy Mosiman, you're dealing with

8    Mr. Swanson; correct?  You're having this conversation; is

9    that right?

10   A.  Yes.

11   Q.  Is there another deputy on the scene that's handling the

12   firearm and taking care of the search?

13   A.  Yes.

14   Q.  And who is that?

15   A.  Deputy Emanuel.

16   Q.  Okay.  Now just to be clear, at the time of the arrest

17   Mr. Swanson had an outstanding felony arrest from Anoka

18   County; correct?

19   A.  Yes.

20   Q.  So he was arrested for that, in your mind?

21   A.  Yes.

22   Q.  Okay.

23           MR. STEINKAMP:  Can I have a moment with counsel,

24   Your Honor?

25           THE COURT:  You may.

1          (Discussion held off the record.)

2          MR. STEINKAMP:  Thank you, Your Honor.  Continue

3     playing at 34:48.

4          (Video exhibit played.)

5     BY MR. STEINKAMP:

6     Q.  All right.  We're at 36:25.  So there's an exchange

7     there about property.  Can you just describe for the Court

8     what happened there, what was going on?

9     A.  Um, well, there was a slip of paper in my hand and I

10    believe that's when he asked me, "That's what's my property,

11    right?"  Which I took to be, Is that going with my property?

12    And I said, "Yes," because it was a slip of paper with a

13    phone number on it for him.

14    Q.  All right.  And you took some property -- you took

15    property with you of Mr. Swanson's; correct?

16    A.  Correct.

17    Q.  And that was the bag with the gun in it; correct?

18    A.  Yes.

19    Q.  And you did that incident to a lawful arrest; correct?

20          MR. MICKO:  Objection, calls for legal conclusion.

21          THE COURT:  Can you repeat the question?

22          MR. STEINKAMP:  I'll rephrase it, Your Honor.

23    BY MR. STEINKAMP:

24    Q.  Why did you take the bag when you arrested Mr. Swanson?

25    A.  To inventory it for his property.

1    Q.  Okay.  And also did you know it had evidence of a crime

2    in it, or at least you think it did?

3    A.  Yes.

4    Q.  What?

5    A.  The firearm.

6    Q.  Okay.  Now -- and in the normal course of when you

7    arrest somebody in this situation, let's assume that you

8    hadn't found the gun or you hadn't been aware of the gun

9    before you looked in the bag; correct?  Just assume that for

10   this situation, my question.  Would you normally take that

11   backpack and inventory it at the Wright County Sheriff's

12   Office?

13   A.  Yes.  Whatever items that we take from someone or for

14   someone to bring to jail, we search and inventory it.

15   Q.  Okay.  So had you not found the gun in the way in which

16   it was found, would that backpack have gone to Wright County

17   and then been inventory searched in the normal course of

18   your duties?

19   A.  Yes.

20         MR. STEINKAMP:  All right.  Now, I guess I'm just

21   going to continue playing this at 36:25, Your Honor.

22         (Video exhibit played.)

23   BY MR. STEINKAMP:

24   Q.  Somebody just, your partner, Deputy Emanuel, said, "It's

25   a Ruger Security 9."  What is that?

```
1    A.  It's a type of a firearm.

2    Q.  What type of firearm is it?

3    A.  A handgun.

4    Q.  Okay.

5            (Video exhibit played.)

6            MR. STEINKAMP:  All right.  I'm stopping at 40:07.

7    BY MR. STEINKAMP:

8    Q.  Deputy, who are you talking to when you made that

9    statement?

10   A.  David Heil, I believe, as far as I can remember.

11   Q.  Okay.  And again, at any point in this -- up to this

12   point, have you asked questions about the underlying

13   offense?

14   A.  No.

15   Q.  Did you do that on purpose?

16   A.  Yes.

17   Q.  Did you engage in conversation with Mr. Swanson so that

18   he would give you incriminating information?  Was that your

19   purpose?

20   A.  No.

21   Q.  What was your purpose of just interacting with him?

22   A.  Um, build rapport and take him into custody and bring

23   him to Wright County Jail on the warrant.

24   Q.  Okay.  I'm going to start up again at 40:07.

25           (Video exhibit played.)
```

```
1    BY MR. STEINKAMP:

2    Q.  All right.  Deputy Mosiman -- I'm stopping at 41:08 for

3    the record.

4            Deputy Mosiman, at that point you're talking to

5    David Heil and the unknown female; correct?

6    A.  Yes.

7    Q.  Was Mr. Swanson in the squad car at that point?

8    A.  Yes.

9    Q.  Were you talking to them in front of him?  Do you know

10   if he could hear you or not?

11   A.  No, I wasn't talking in front of him.  I don't believe

12   he could hear me.

13   Q.  Okay.

14           MR. STEINKAMP:  Starting up again at 41:08.

15           (Video exhibit played.)

16           MR. STEINKAMP:  All right.  I don't have any

17   further questions of the witness, Your Honor.  I will just

18   rely on the exhibits for the remainder of the statements.  I

19   don't think we need to go through them with the witness, so

20   thank you.

21           THE COURT:  Thank you.

22           Cross-examination, Mr. Micko?

23           MR. MICKO:  Thank you, Your Honor.

24           May I remove my mask, Your Honor?

25           THE COURT:  You may.  Thank you, counsel.
```

```
 1              MR. MICKO:  Thank you.

 2                    CROSS-EXAMINATION

 3   BY MR. MICKO:

 4   Q.  Deputy Mosiman, am I saying your name right, Mosiman?

 5   A.  Mosiman.

 6   Q.  Mosiman.  I'm sorry.  Just, I think, a few questions for

 7   you, and I'm not going to be going through this video we're

 8   just talking about; okay?

 9   A.  Okay.

10   Q.  When you came out to see Jerome Swanson, you came there

11   to arrest him; right?

12   A.  Correct.

13   Q.  And that wasn't just on the outstanding warrant; right?

14   A.  The primary reason was the warrant.  I think we

15   discussed that on the phone call with him.

16   Q.  Okay.  Go ahead.

17   A.  No, sorry.  Go ahead.

18   Q.  And on that phone call Mr. Swanson told you that he

19   wanted to talk to you; right?

20   A.  Yes.

21   Q.  Okay.  And did you, during that phone call, do anything

22   to tell him that you weren't the right person to talk to

23   about this offense?

24   A.  During the phone call?

25   Q.  Yes.
```

1    A.  I don't recall.

2    Q.  Okay.  Did you tell him you were coming out to arrest

3    him?

4    A.  I don't recall the exact wordage that I used during that

5    phone call.

6    Q.  Now, he called you; right?

7    A.  I believe David Heil called and said that he was with

8    Jerome.

9    Q.  Okay.  And then he turned the phone over to Mr. Swanson;

10   right?

11   A.  Correct.

12   Q.  The two of you talked for some time?

13   A.  Yes.

14   Q.  And Mr. Swanson told you that there was some things that

15   he needed to talk to you about; right?

16   A.  As far as I can remember, yeah, that sounds accurate.

17   Q.  And we watched the video.  It looks like about two

18   minutes after you arrived you arrested Mr. Swanson; right?

19   A.  Correct.

20   Q.  Okay.  Handcuffs were behind the back?

21   A.  Yes.

22   Q.  That's protocol; right?

23   A.  Right.

24   Q.  Double locked?

25   A.  Correct.

```
 1    Q.  What does that mean?

 2    A.  "Double locked" means there's a function on the

 3    handcuffs where I can press a button so when you click the

 4    handcuffs on, it doesn't tighten up if they are behind the

 5    back if he's sitting down.  So you check for proper fit and

 6    double lock the cuffs so they don't get any tighter.

 7    Q.  And I think you said that kind of -- well, will you

 8    agree with me this video that we're looking at in Exhibit 2,

 9    you can't really see any interactions between you and

10    Mr. Swanson; right?

11    A.  Right.

12    Q.  Okay.  But my understanding is you were there; right?

13    A.  Correct.

14    Q.  And another deputy was there.  Is it Deputy Emanuel?

15    A.  Emanuel.

16    Q.  Emanuel?

17    A.  Correct.

18    Q.  How many other law enforcement officers were there?

19    A.  Just the both of us.

20    Q.  Okay.  And for the purpose of safety, is that why you

21    moved in to kind of arrest Mr. Swanson almost right after

22    you got there?

23    A.  Correct.

24    Q.  You indicated that at some point during this encounter

25    Mr. Heil came out with a couple of bags.  Do you remember
```

1   that?

2   A.  Yes.

3   Q.  Okay.  And when I say "do you remember that," let me be

4   more clear.  Do you remember that happening at the time?

5   You don't just remember your prior testimony on that; right?

6   A.  I remember him bringing out Jerome's belongings.  I was

7   focused on Jerome, and Deputy Emanuel was in close proximity

8   and that was going on as well, so...

9   Q.  And -- but you saw that at some point Mr. Heil put those

10  bags down.  Is that right?

11  A.  I don't remember from the time.

12  Q.  Well, you remember it was Mr. Heil holding onto the

13  bags?

14  A.  When he initially comes out, yes.

15  Q.  But he didn't keep holding onto them; right?

16  A.  I don't remember.

17  Q.  Okay.  Well, at some point at least one of those bags

18  was searched; right?

19  A.  Right.

20  Q.  And you testified about that bag being searched like you

21  did remember just a little bit ago, didn't you?

22  A.  Correct.

23  Q.  Okay.  And do you remember that bag being searched while

24  somebody else was holding it?

25  A.  I believe Deputy Emanuel was holding it while he was

1    searching it.

2    Q.  So at some point Mr. Heil got rid of that bag?

3    A.  Correct.

4    Q.  Put it down?

5    A.  Put it down or gave it to Deputy Emanuel.  The

6    transaction, I'm -- I don't recall.

7    Q.  Okay.  But one of the things -- when Mr. Steinkamp was

8    talking to you about the safety risk that might attach to

9    having a firearm in a bag, you said one of your concerns was

10   that Mr. Swanson might -- might get a hold of that firearm;

11   right?

12   A.  That was one of the concerns, yes.

13   Q.  Okay.  And this is when Mr. Swanson is cuffed behind his

14   back; right?

15   A.  Correct.

16   Q.  And you said he was about five to seven feet from the

17   bag?

18   A.  Correct.

19   Q.  Okay.  How long have you been a police officer

20   altogether?

21   A.  A little over two years.

22   Q.  Okay.  Have you ever had a situation in your two years

23   where somebody five to seven feet away from a bag, locked

24   behind their hands [sic], is able to get into a backpack and

25   get a gun?

```
1    A.  No, not in my two years.

2    Q.  Did you ever see a firearm in a backpack before Deputy

3    Emanuel searched the backpack?

4    A.  Are you asking me if I've ever seen any type of firearm

5    or the firearm that we're discussing?

6    Q.  No, I'm sorry if I wasn't clear.  The firearm we're

7    discussing.

8    A.  No.

9    Q.  It wasn't until Deputy Emanuel opened the backpack and

10   searched through it that a gun became visible; is that

11   right?

12   A.  Correct.

13   Q.  When you arrested Mr. Swanson -- well, let me back up.

14   You know what booking questions are; right?

15   A.  What do you mean by that?

16   Q.  Questions you might ask somebody consistent with

17   arresting them or booking them.

18   A.  Correct.

19   Q.  Have you done that?

20   A.  Like questions that I would ask?

21   Q.  Yes.

22   A.  Can you describe that a little?

23   Q.  Name?

24   A.  Yes.

25   Q.  Things like that?
```

1    A.   Yes, name.

2    Q.   So I guess I refer to them as booking questions, but did

3    you engage in that kind of preliminary conversation with

4    Mr. Swanson in this case?

5    A.   I don't recall.

6    Q.   But again, you knew from your phone call one of the

7    reasons he wanted you to come out was to be able to talk to

8    you; right?

9    A.   Correct.

10   Q.   Okay.  We went through a good deal of this video and you

11   reviewed the whole thing; right?

12   A.   Correct.

13   Q.   Okay.  At any point during that video did you give

14   Mr. Swanson what's known as a Miranda warning?

15   A.   No.

16   Q.   Okay.  And you know what a Miranda warning was; right?

17   A.   Yes.

18   Q.   I guess I am assuming that the video is accurate.  Is

19   there any -- any time during your encounter with Mr. Swanson

20   that's not captured on the video that you administered a

21   Miranda warning?

22   A.   No.

23   Q.   And from your training and experience, you must know the

24   Miranda warning like the back of your hand; right?

25   A.   I normally will take it out.  I know it, but I normally

1    take it out and read it verbatim off of a card.

2    Q.  You carry a card?

3    A.  Yes.

4              MR. STEINKAMP:  Objection.  It's not relevant.  He

5    didn't give the Miranda warning so this is all surplus.

6              THE COURT:  Well, I will overrule the objection.

7    BY MR. MICKO:

8    Q.  Do you have the card with you?

9    A.  I believe it's in my coat.

10   Q.  Okay.

11   A.  Outside.

12   Q.  The Miranda warning includes several components; right?

13   A.  Yes.

14   Q.  And that's one of the reasons it might be important to

15   have a card so you don't miss something; right?

16   A.  Correct.

17   Q.  One of the rights that's described is the right to

18   remain silent; is that right?

19   A.  Yes.

20   Q.  Did you tell Mr. Swanson that he had the right to remain

21   silent?

22   A.  No.

23   Q.  Okay.  Another portion of the Miranda warning says that

24   anything that you say might be held against you; right?

25   A.  Correct.

1    Q.  And did you tell Mr. Swanson at any time during your

2    encounter that anything he said might be held against him?

3    A.  No.

4    Q.  Another part of the Miranda warning instructs somebody

5    that they might have a right to have an attorney present

6    when they are questioned; is that right?

7    A.  Correct.

8    Q.  Did you tell Mr. Swanson that he might have a right to

9    have an attorney present during the time that he's

10   questioned?

11   A.  No.

12   Q.  I want to turn for a minute to some discussion you had

13   earlier about inventorying property.  Do you remember that

14   discussion?

15   A.  Yes.

16   Q.  Okay.  Mr. Steinkamp asked you, and I'm not going to say

17   it verbatim, but Mr. Steinkamp asked you, in essence, what

18   would you do hypothetically if you were arresting somebody

19   and you were taking their property with them.  Do you

20   remember that?

21   A.  Yes.

22   Q.  And I think your testimony was that you would conduct an

23   inventory of that property; correct?

24   A.  Correct.

25   Q.  And part of the reason to do that is to make sure that

```
 1   none of that property gets lost; right?
 2   A.  Yes.
 3   Q.  Okay.  Now, there were two backpacks in this case;
 4   right?
 5   A.  Yes, I believe so.
 6   Q.  Okay.
 7   A.  From what I can recall.
 8   Q.  And one of those backpacks had quite a few of
 9   Mr. Swanson's belongings in them; clothes, things like that.
10   Do you remember that?
11   A.  Yeah, I believe he said he had clothes in a backpack.
12   Q.  And that was the one that Mr. Swanson said it's okay to
13   go ahead and take a look through that backpack.  Do you
14   remember that?
15   A.  Yes.
16   Q.  Now, the other backpack is the backpack that contained
17   the firearm; correct?
18   A.  Correct.
19   Q.  Okay.  Did Mr. Swanson ever tell you that he wanted to
20   take that backpack with him if he was arrested?
21   A.  I don't recall.  From the video, no, that we just
22   watched.
23   Q.  Okay.  And you will agree with me that the video
24   captures the entire time that you're at the residence with
25   Mr. Swanson and leaving the residence in your car with
```

1    Mr. Swanson in the back; correct?

2    A.  Correct.

3    Q.  So is it a fair assumption that if Mr. Swanson was

4    saying to you, Deputy, I'd like to bring that backpack with

5    me, that that would have happened before you left; right?

6    A.  Correct.

7    Q.  So it would have been captured on that video; right?

8    A.  Well, on audio.

9    Q.  I'm sorry.  The recording?

10   A.  Right.

11   Q.  The audio portion of the recording; is that what you're

12   saying?

13   A.  Yeah.

14   Q.  And if it's not on there, we can assume it didn't

15   happen; is that right?

16   A.  There was some audio that I couldn't hear from the

17   video, so...

18   Q.  As you sit here today independently, do you remember any

19   time that Mr. Swanson said to you anything that indicated he

20   would want to take with him this other backpack that

21   contained the firearm?

22   A.  No.

23   Q.  Okay.

24              MR. MICKO:  That's all I have, Your Honor.

25              THE COURT:  Thank you.  Any redirect?

```
1              MR. STEINKAMP:  Yeah, just briefly, Your Honor.
2                        REDIRECT EXAMINATION
3    BY MR. STEINKAMP:
4    Q.  Deputy Mosiman, you didn't read the Miranda warning
5    because you never intended to question the defendant,
6    Mr. Swanson; correct?
7              MR. MICKO:  Objection, leading.
8              THE COURT:  Sustained.  If you could ask non-
9    leading questions, counsel.
10             MR. STEINKAMP:  Just trying to speed it along.  I
11   apologize, Your Honor.
12   BY MR. STEINKAMP:
13   Q.  Why didn't you read him the Miranda warning?
14   A.  I didn't read him the Miranda warning because I wasn't
15   asking any type of interrogating questions while he was in
16   custody.
17   Q.  Okay.  And you arrested him -- you were asked to arrest
18   him immediately on the scene; correct?
19   A.  Correct.
20   Q.  It was soon after; correct?
21   A.  Yes.
22   Q.  But yet -- why did you arrest him immediately?  Why
23   didn't you just wait?
24   A.  Because in that particular incident it was linked to a
25   shooting.  And so if there was a suspect on scene or if
```

```
 1    they -- the suspect on scene I believe should be handcuffed

 2    as soon as possible for safety.

 3    Q.  Did you have the authority to arrest him immediately?

 4    A.  Correct, I did.

 5    Q.  How so?

 6    A.  Off of the warrant.

 7    Q.  Is it your practice normally to tell individuals ahead

 8    of time that you're going to come and arrest them?

 9    A.  No.

10    Q.  Why?

11    A.  It would -- I mean, it would alarm them probably, and

12    they could possibly flee or this or that.  I don't --

13    Q.  Well, did Mr. -- was there an incident earlier in the

14    day when Mr. Swanson wasn't responsive to law enforcement's

15    appearance?

16    A.  Yes.

17    Q.  Okay.

18          MR. STEINKAMP:  Nothing further, Your Honor.

19    Thank you.

20          THE COURT:  Thank you.  Any further cross?

21                   RECROSS-EXAMINATION

22    BY MR. MICKO:

23    Q.  Deputy, do you still have Exhibit 3 in front of you?

24    A.  The transcript here?

25    Q.  Yes.
```

1    A.  Yes.

2    Q.  And based -- I know we've kind of covered this, but

3    based off of your review of the electronic recording here,

4    this transcript appears to be mostly accurate?

5    A.  Yes, mostly accurate.

6    Q.  And the MM is you?

7    A.  Yes.

8    Q.  Okay.  Start time is 28:06.  That's about when you

9    arrived; is that right?

10   A.  Correct.

11   Q.  Okay.  Can you read the first two lines that you say as

12   MM after you arrived at 28:06?

13   A.  "Jerome, all right.  You want to come talk to me?"

14           MR. MICKO:  I have nothing further, Your Honor.

15           THE COURT:  Thank you.  Anything further,

16   Mr. Steinkamp?

17           MR. STEINKAMP:  No, Your Honor.

18           THE COURT:  All right.  The witness is excused.

19   And why don't we talk about a break here and I'll turn here

20   to our court reporter, for the length of the break.

21           (Discussion held off the record.)

22           THE COURT:  I think we're back on the record, and

23   I deferred to the court reporter and we can proceed with

24   another witness.  Mr. Steinkamp, you may call your next

25   witness.

 1                    MR. STEINKAMP:  Thank you.  The Government calls

 2      Deputy Andrew Emanuel.

 3                    THE COURT:  I'd ask the witness to step into the

 4      witness box and remain standing for a moment here.  If you

 5      could raise your right hand.

 6                    Do you swear in the testimony you're about to give

 7      to tell the truth, the whole truth, and nothing but the

 8      truth?

 9                    MR. EMANUEL:  I do.

10                    THE COURT:  Thank you.  Please be seated.  And

11      just be seated there.  I want to make sure that from the

12      defense table the view is sufficient here?

13                    THE DEFENDANT:  Yes, Your Honor.

14                    THE COURT:  Thank you.  So if the witness will

15      please state his full name.  Spell first and last name,

16      please.

17                    THE WITNESS:  My full name is Andrew James

18      Emanuel.  A-N-D-R-E-W, E-M-A-N-U-E-L.

19                    THE COURT:  Thank you.  And there should be a

20      little cover on the microphone.  In that little clear box,

21      there are little covers and if you could put the cover on

22      the -- not on the speaker but on your mic.  It's a little

23      sleeve.  Thank you.  And so if you could also get close to

24      that microphone when you're speaking and speak slowly so our

25      court reporter can get down all the words.

1          Thank you, counsel.  You may proceed.

2                    **(ANDREW EMANUEL)**

3                    **DIRECT EXAMINATION**

4          MR. STEINKAMP:  Thank you, Your Honor.

5     BY MR. STEINKAMP:

6     Q.  Sir, where are you currently employed?

7     A.  With the Wright County Sheriff's Office.

8     Q.  All right.  And what's your duties there?

9     A.  I'm a patrol deputy.

10    Q.  How long have you been with the Wright County Sheriff's

11    Department?

12    A.  A little bit over three years as a patrol deputy, and I

13    was a correctional officer for two years before that.

14    Q.  In Wright County?

15    A.  In Wright County.

16    Q.  All right.  What's your education?

17    A.  I have an associates in applied science in law

18    enforcement from Alexandria Technical College, in which I

19    graduated in 2008.

20    Q.  Okay.  And so you began in law enforcement, it sounds

21    like, around 2016 as a jailer?

22    A.  Correct.

23    Q.  Okay.  All right.  I'm just going to direct your

24    attention to June 7th of 2021.  Were you on duty that day?

25    A.  Yes.

1    Q.  And you were working in the area of Otsego in Wright

2    County?

3    A.  Correct.

4    Q.  Again, were you dressed in a -- your uniform as you have

5    on now and patrolling in a marked squad car?

6    A.  I had a different uniform because we have bullet bearing

7    vests, but it's our approved uniform and a marked squad.

8    Q.  Okay.  All right.  At about 8:00 -- around 8 o'clock,

9    8:03, somewhere like that, on June 21, were you contacted by

10   Deputy Mosiman to assist at ████████████████████ in Otsego?

11   A.  I was in the office with him and he had asked me to

12   assist, yes.

13   Q.  Okay.  So you went with him from the office.

14           And were you aware of the nature of why you were

15   going to that location?

16   A.  Yes, I was.

17   Q.  What did you understand it to be about?

18   A.  That there was a vehicle that was stolen out of

19   Minneapolis.  The driver had been shot.  The vehicle was

20   located at the address in Otsego; and then we were going to

21   arrest the primary suspect for the theft, possession of

22   vehicle theft, and he also had an outstanding motor vehicle

23   theft warrant.

24   Q.  Okay.  And was it you or Deputy Mosiman who received the

25   details about the vehicle and the shooting and all that?

```
 1    A.  Deputy Mosiman.

 2    Q.  Okay.  So you -- he relayed to you the facts you have

 3    just talked about?

 4    A.  Yes.

 5    Q.  But you don't -- I'll leave that.

 6              So you recall going to the ██████████████

 7    location?

 8    A.  Yes.

 9    Q.  And when you got there, what did you do?

10    A.  We exited our vehicles and made contact with Jerome.

11    After, I stood by and to assist and make sure Deputy Mosiman

12    was safe while he was -- Jerome was placed under arrest.

13    Q.  When you say "Jerome," just so we're clear for the

14    record, who are we talking about?

15    A.  The defendant.

16    Q.  And do you know his full name?

17    A.  I do not offhand.

18    Q.  Okay.  But when you say "the defendant," can you -- do

19    you see the individual you're talking about as Jerome in the

20    courtroom here?

21    A.  Yes, I do.

22    Q.  And could you just identify him for the record?

23    A.  The male in the orange sweatshirt.

24    Q.  Okay.

25              MR. STEINKAMP:  The record will reflect that he
```

1    identified the defendant, Your Honor.

2              THE COURT:  Thank you.

3    BY MR. STEINKAMP:

4    Q.  Now, while you were there, was -- who was dealing

5    primarily with Mr. Swanson, the defendant?

6    A.  Deputy Mosiman was.

7    Q.  What were you doing?

8    A.  I was just assisting, making sure there was no issues

9    and he didn't need any help with the scene.

10   Q.  Is it fair to say you were providing backup?

11   A.  Correct.

12   Q.  Okay.  And so you were making observations at the scene;

13   correct?

14   A.  Correct.

15   Q.  At some point during this encounter did anyone come out

16   of the house where you were at?

17   A.  Yes.  A male had approached me and gave me two

18   backpacks.  The male was identified as David Heil and he

19   gave me the backpacks and said they belonged to Jerome.

20   Q.  Did he make any other statements that were significant

21   to you?

22   A.  Yes, he pointed at one of the backpacks and said that

23   there was a firearm in that backpack.

24   Q.  Okay.  And about how far are you from the defendant at

25   this point?  How far is the defendant from the bag?

1    A.  I would say about five feet.

2    Q.  And were there other people present on scene?

3    A.  Yep, we have the David Heil that gave me the backpack,

4    and then there was another unidentified female.

5    Q.  Okay.  Now, you didn't know -- you didn't know if David

6    Heil was involved in any of this; correct?

7    A.  I did not.

8    Q.  You didn't know if the woman was involved?

9    A.  I did not.

10   Q.  When you heard that there was a firearm in the backpack,

11   did you take -- did you take measures to secure it?

12   A.  Yes, I did.

13   Q.  What did you do?

14   A.  I opened the backpack, looked inside of it, saw that

15   there was an uncased firearm, no holster or anything, just a

16   firearm in the bottom of the backpack.  I picked up the

17   firearm and ejected a magazine, cleared the chamber to

18   ensure that it was not loaded.

19   Q.  What kind of gun was it?

20   A.  It was a Ruger Security 9.

21   Q.  And what -- what type of gun is that?

22   A.  It was a semiautomatic pistol.

23   Q.  Okay.  Did you say that was there bullets in it?

24   A.  Yes, there was bullets in the magazine and one in the

25   chamber.

1    Q.  Okay.  Does one in the chamber mean if you pull the

2    trigger the gun would go off?

3    A.  Depending on if there was a safety, but it could

4    potentially go off if you pulled the trigger.

5    Q.  Okay.  Did you have concerns when you heard the words

6    "There's a firearm in there?"

7    A.  Yes.

8    Q.  What concerns did you have?

9    A.  Concerns on anybody on scene potentially attempting to

10   grab the firearm and potentially use it on myself, partners,

11   innocent bystanders.  And then also just not knowing the

12   state of the firearm, if it could potentially go off in the

13   bag by accident.

14   Q.  Have you known that to happen?

15   A.  Yes.

16   Q.  What about Mr. Swanson.  Was he a potential threat?

17   A.  Yes, he was.

18   Q.  How so?

19   A.  He was handcuffed, but again, he was within reaching

20   distance.  He would have been able to -- he could have

21   walked over there and tried to obtain the firearm and use it

22   and he could have tried to slip out of the cuffs, get the

23   cuffs in front of him somehow.

24   Q.  Have you ever experienced that or known people to have

25   done that in your experience?

1   A.  Yes.

2   Q.  What I'm talking about is getting out of the cuffs.

3   A.  Getting out of the cuffs and getting them in front of

4   you.

5   Q.  Okay.  And when Mr. Heil set down the bag, how far was

6   he from it when he said, "There's a firearm in there?"

7   A.  He set it down and stepped back, but he was only -- he

8   was within five feet of it.

9   Q.  Okay.  Then ultimately did you -- after you looked in

10  the backpack, did you remove the firearm?

11  A.  Yep, I removed it and the bullets and magazine and put

12  them in an evidence bag and made sure the gun was secured

13  for transport.

14  Q.  All right.  Although -- did you then take the bag that

15  the firearm had been in or did you just take the firearm

16  itself?

17  A.  We -- I had searched -- after the firearm was secured, I

18  searched the rest of the bag and we took the backpack and

19  the firearm and the rest of the contents and they were

20  entered into evidence by Deputy Mosiman.

21  Q.  Okay.  Did you have information that the -- those bags

22  were Mr. Swanson's?

23  A.  Again, when they were delivered to me by Mr. Heil, he

24  indicated that they were Mr. Swanson's.  And then throughout

25  our encounter with him, he had admitted that one -- the

1    other backpack was his and had his belongings in it.

2    Q.  Who is "he" in that scenario?

3    A.  Mr. Swanson.

4    Q.  Okay.  Did he ever admit that the backpack with the gun

5    was his?

6    A.  I do not recall.

7    Q.  Okay.  Now, had you not found the gun in the backpack,

8    is it your normal procedure to take someone's belongings

9    with them and inventory -- and have the contents of their

10   belongings inventoried?

11   A.  Yes, at the jail.

12   Q.  If you had not found the gun here, would you have done

13   that with the backpack?

14   A.  Yes, the backpack would have been brought in with

15   Mr. Swanson to the jail and turned over as property, and the

16   jail staff would inventory it as per their policy.

17   Q.  Is it a requirement that you take every bag or do you

18   have discretion in that?

19   A.  Unless requested by the person being arrested, we

20   usually take their -- we will take their belongings unless

21   they request them not to be taken and left where we are.

22   Q.  All right.

23          MR. STEINKAMP:  No further questions, Your Honor.

24   Thank you.

25          THE COURT:  Thank you.

1              Cross-examination, Mr. Micko?

2              MR. MICKO:  Thank you, Your Honor.  May I take my

3      mask off?

4              THE COURT:  You may.

5                       **CROSS-EXAMINATION**

6      BY MR. MICKO:

7      Q.  Deputy Emanuel, you wrote a report in this case?

8      A.  Yes, I did.

9      Q.  Do you have it with you?

10     A.  Yes, I do.

11     Q.  Okay.  Why did you write a report in the case?

12     A.  Because I was involved in the arrest and I located a

13     firearm which was taken as evidence.

14     Q.  And I don't want to put words in your mouth but I assume

15     another part of this is as a law enforcement officer, that's

16     the protocol when there's an open investigation; correct?

17     A.  Correct.

18     Q.  Part of the reason you do that is so you can have

19     something down on paper while it's fresh in your mind;

20     right?

21     A.  Correct.

22     Q.  The report is supposed to contain everything that's

23     important about the investigation; right?

24     A.  My part of the investigation.

25     Q.  Fair enough.  Your part of the investigation; right?

1    A.  Correct.

2    Q.  And is that something you have been doing when you have

3    been a deputy at Wright County?

4    A.  Yes.

5    Q.  Okay.  It's also something you did when incidents arose

6    when you were a corrections officer?

7    A.  Correct.

8    Q.  Consistent with your training when you were at

9    Alexandria Tech; right?

10   A.  Correct.

11   Q.  Okay.  In the report you wrote here, you indicated that

12   the backpack was searched incident to Mr. Swanson's arrest;

13   right?

14   A.  Yes.

15   Q.  And there's nothing in your report about concerns for

16   officer safety as justifying the search of the backpack, is

17   there?

18   A.  Correct.

19   Q.  Okay.  Today you're saying it's officer safety?

20   A.  It was also a concern at the time but it was not put in

21   the report.

22   Q.  Say that again?

23   A.  It was a concern at the time as well with any type of

24   live firearm that's unsecured, but it was not put in the

25   report, that is correct.

1    Q.  Was there something that kept you from putting it in the

2    report?

3    A.  No.

4    Q.  You indicated that the goal of your detail that day on

5    this call was to go and arrest the primary suspect.  Is that

6    right?

7    A.  Correct.

8    Q.  The primary suspect was Mr. Swanson?

9    A.  Correct.

10   Q.  You're -- you drove your own squad car; right?

11   A.  Correct.

12   Q.  That squad had video?

13   A.  Yes.

14   Q.  Did you review that video in preparation for today's

15   hearing?

16   A.  Yes.

17   Q.  Okay.  That video -- would you agree with me that that

18   video seems to capture the actual scene of the arrest and

19   the search?

20   A.  I believe it does an accurate job.

21   Q.  It does an accurate job?

22   A.  Yes.

23   Q.  Now, on that video you can see Mr. Swanson; right?

24   A.  Yep.

25   Q.  Okay.  And yourself?

1    A.  Yes.

2    Q.  Okay.  And you can see Deputy Mosiman, too; right?

3    A.  Yes.

4    Q.  You can see in that video when Mr. Heil comes out with

5    these two backpacks; correct?

6    A.  To the -- I was unable to review Deputy Mosiman's squad

7    video and he was parked in front of me and had a better view

8    of the scene.  I was only able to review my squad video, so

9    I'm unsure if you're referring to my video or Deputy

10   Mosiman's video?

11   Q.  Your video.

12   A.  Okay.  To the best of my recollection, yeah, you see

13   Mr. Heil come out or enter the scene.

14   Q.  And I think you said earlier that those backpacks were

15   placed about five feet away from Mr. Swanson?

16   A.  I -- again, they were placed in front of me.  I was

17   approximately five feet away from Mr. Swanson.

18   Q.  Okay.  So when the backpacks came out, you're standing

19   in a place and the backpacks are put right at your feet;

20   right?

21   A.  Correct.

22   Q.  Mr. Swanson is about five feet away from you?

23   A.  Correct.

24   Q.  Handcuffed behind his back?

25   A.  Correct.

1   Q.  Okay.  And you said earlier that you're aware of times

2   where somebody would, I think the phrase was "slip their

3   handcuffs"?

4   A.  Attempt to get out of handcuffs or get out of handcuffs;

5   yes, it has happened.

6   Q.  Has that ever happened on any of your calls?

7   A.  I know it has.  I cannot recall incidents either at the

8   jail or on the deputy.  I know I've run into it, but I don't

9   remember specific cases.

10  Q.  Okay.  What -- what period of time elapsed between

11  Mr. Heil coming out and dropping off these backpacks by your

12  feet and you opening it up and searching it?

13  A.  I clarified with Mr. Heil.  He said there was a firearm

14  in there.  I said -- I asked if I -- I confirmed that -- I

15  asked if there was a firearm in there, if there was a gun in

16  there.  I don't remember my exact phrase.  He said yes.  And

17  then I opened up the backpack and observed the firearm in

18  the backpack, at the bottom of the backpack.

19  Q.  And this wasn't a situation where you could see that

20  firearm before you opened up the backpack; right?

21  A.  I could not see the gun before, the firearm before I

22  opened it.

23  Q.  The backpack was closed?

24  A.  Correct.

25  Q.  Okay.  Did you see -- or do you recall Mr. Swanson

1   making any moves that were consistent with trying to wriggle

2   out of his handcuffs one way or another?

3   A.  Not that I recall.  Once the backpacks were brought in

4   front of me, my concern was focusing on a potential live

5   fire, live weapon.

6   Q.  And there was a question earlier about these other folks

7   at the scene.  Do you remember that?

8   A.  Yes.

9   Q.  Okay.  You said you didn't know what somebody like

10   Mr. Heil, what his involvement was in this; right?

11   A.  Correct.

12   Q.  Okay.  But your -- your job is kind of all about making

13   deductions; right?

14   A.  Yes.

15   Q.  Yeah.  And isn't it a fair deduction that somebody who

16   brings you a backpack saying there's a firearm in it isn't a

17   threat to be using that firearm?

18            MR. STEINKAMP:  Objection.  He's already answered

19   it and it calls for speculation, Your Honor.

20            THE COURT:  I'll overrule the objection.

21            THE WITNESS:  It's a fair assumption but not a

22   guarantee.

23   BY MR. MICKO:

24   Q.  It's not -- fair enough.  It's not a guarantee.  But you

25   didn't take any steps to pat down Mr. Heil, did you?

```
 1    A.  No, I did not.

 2    Q.  Or the female who was present?

 3    A.  I did not.

 4    Q.  Didn't put any of them in handcuffs?

 5    A.  I did not.

 6    Q.  And they were further away from the backpack than you

 7    were; right?

 8    A.  Yes.

 9    Q.  Okay.  You spoke for a minute about the inventory of

10    somebody's property if they are being arrested.  Do you

11    remember that?

12    A.  Yes.

13    Q.  Okay.  And I think your testimony was that the person's

14    property would typically be inventoried if it was going with

15    them; right?

16    A.  By the jail staff at minimum.

17    Q.  By the jail staff.  And you know that because you used

18    to be jail staff; right?

19    A.  Yes.

20    Q.  Do you remember Mr. Swanson ever asking to have that

21    backpack go with him?

22    A.  When I reviewed the video I can hear him -- and looking

23    at the transcript -- he indicates a second backpack; but I

24    do not recall anything him talking about the other backpack

25    that contained the firearm.
```

```
 1                MR. MICKO:  Okay.  That's all I have.  Thank you,
 2    Your Honor.
 3                THE COURT:  All right.  Thank you.
 4                Any redirect?
 5                MR. STEINKAMP:  Yes, just briefly.
 6                        REDIRECT EXAMINATION
 7    BY MR. STEINKAMP:
 8    Q.  Deputy Emanuel, I'm asking you to answer a hypothetical.
 9    If the gun had not been found in the backpack, do you take
10    people's property with them to the jail?
11    A.  Yes, we do.
12    Q.  And when it gets there, does it get inventoried by the
13    jail staff?
14    A.  Yes, it does.
15    Q.  Okay.  I'm not talking about this situation.  I'm
16    talking about in a regular situation if this gun had not
17    been found.
18    A.  Yes.
19    Q.  Okay.
20                MR. STEINKAMP:  No further questions, Your Honor.
21                THE COURT:  Thank you.  Any further cross?
22                MR. MICKO:  No, Your Honor.
23                THE COURT:  Mr. Micko, you referenced what I think
24    is a different video, and I just want to make sure that
25    that's not something that is -- has been submitted to the
```

1    Court.  We've got the one that's more of an audio, but is

2    there an exhibit that I'm missing?

3              MR. MICKO:  No, Your Honor.  I can represent to

4    the Court that as a part of discovery the Government had

5    turned over a couple of different squad videos and one was

6    for Deputy Mosiman and one was from Deputy Emanuel.

7              THE COURT:  All right.  Just based on your

8    questioning I wasn't sure if I should have it.  But you're

9    not seeking to submit that to the Court?

10             MR. MICKO:  No, Your Honor.

11             THE COURT:  All right.  Thank you, so much.

12             MR. STEINKAMP:  And the Government didn't either

13   because we believed that the issues were covered by the one

14   video, trying to keep it a little more efficient for the

15   Court.  Thank you.

16             THE COURT:  Thank you, Mr. Steinkamp.  I was just

17   wanting to confirm given that we're getting -- receiving

18   these sometimes by e-mail or other delivery, I wanted to

19   make sure that I had the complete record.

20             So I think we're -- the witness can step down off

21   the witness stand and if you could please take off that

22   little sleeve on the microphone there, that would be great.

23             MR. MICKO:  Your Honor, I think the black part

24   went with it.

25             THE COURT:  We'll need that.  Now we're really

1    testing your AV skills here.  Why don't you just -- we're

2    not on the record here.

3                 (Discussion held off the record.)

4                 THE COURT:  Should we take a break now?  We're in

5    recess ten minutes.

6                 MR. STEINKAMP:  Thank you.

7        (Recess taken at 2:29 p.m.)

8                           *    *    *    *    *

9        (2:40 p.m.)

10                            **IN OPEN COURT**

11

12                THE COURT:  All right.  We are back on the record

13   after a brief recess.  Is the Government ready to call its

14   next witness?

15                MR. STEINKAMP:  Yes, Your Honor.  The Government

16   calls Chad Edlund.

17                THE COURT:  And I'll ask the witness to please

18   step up to the witness box.  You will see in a little clear

19   plastic box in front of you some little sleeves to put over

20   the microphone.  If you could start there.  Put a sleeve

21   over the microphone.  Thank you.  And if you would remain

22   seated, raise your right hand.

23                Do you swear in the testimony you're about to give

24   to tell the truth, the whole truth, and nothing but the

25   truth?

 1                 MR. EDLUND:  I do.

 2                 THE COURT:  Thank you.  Please be seated.  And

 3      state your full name and spell both your first and last

 4      name.

 5                 THE WITNESS:  My full name is Chad Richard Edlund.

 6      Chad is spell C-H-A-D.  Edlund is spelled E-D-L-U-N-D.

 7                 THE COURT:  Thank you.  And if you could please

 8      speak up and get your face right up close to that microphone

 9      and speak up and try to speak slowly.

10                 THE DEFENDANT:  Yes, ma'am.

11                 THE COURT:  Counsel, you may proceed.

12                 Oh, and you may take your mask off.

13                           **(CHAD EDLUND)**

14                        **DIRECT EXAMINATION**

15      BY MR. STEINKAMP:

16      Q.  Okay.  Sir, could you please tell the Court where you're

17      currently employed?

18      A.  I'm employed by the FBI, Minneapolis.

19      Q.  So you're a Special Agent with the FBI?

20      A.  Yes, sir.

21      Q.  And what areas do you work at the FBI?

22      A.  I primarily work criminal and terroristic

23      investigations.

24      Q.  Okay.  And how long have you been a Special Agent?

25      A.  Since 2011.

1    Q.  What's your educational background?

2    A.  I have an undergraduate degree in economics and a

3    graduate degree in public administration.

4    Q.  Okay.  Are you familiar with an investigation into a

5    shooting and carjacking involving a suspect Jerome Swanson?

6    A.  Yes, sir.

7    Q.  Were you -- did you provide some assistance in that

8    investigation?

9    A.  Yes, sir.

10   Q.  Does the FBI at times work with the Minneapolis Police

11   Department to solve these violent crimes?

12   A.  Yes, sir.

13   Q.  Okay.  And were you working with Agent Langert, who was

14   the primary agent on that case, when you assisted?

15   A.  Yes, sir.

16   Q.  All right.  Directing your attention to June 9th of

17   2021, were you asked to prepare what's called a photo lineup

18   in this case regarding Mr. Swanson?

19   A.  Yes, sir.

20   Q.  And did you cause a photo lineup to be prepared?

21   A.  Yes, sir.

22   Q.  How was that done?

23   A.  Using a system called MRAP, which you enter parameters

24   in order to create a lineup of six people.

25   Q.  Okay.  And those parameters, are they chosen by the

1    person requesting the lineup?

2    A.  Yes, sir.

3    Q.  And what are those -- what's an example of some of those

4    parameters?

5    A.  It could include age, it could include complexion, eye

6    color, hair color, facial hair.

7    Q.  All right.  And then this computer program that's been

8    created randomly creates this lineup which you can then get

9    access to?

10   A.  Yes, sir.

11   Q.  And is the lineup done in that way to try to create a

12   non-suggestive lineup, a lineup with people that appear

13   similar?

14   A.  Yes, sir.

15   Q.  All right.  So in this case you did that; correct?

16   A.  Yes, sir.

17   Q.  And I'm referring you to Government's Exhibit 1, which I

18   think you have a copy of with you?

19   A.  Yes, sir.

20   Q.  Could you just take a look at that?  Have you had a

21   chance to look at it?

22   A.  Yes, sir.

23   Q.  Is that the -- that's the lineup you created?

24   A.  Yes, sir.

25   Q.  Or had created, I should say.

1    A.  That is correct, sir.

2    Q.  Now, on this particular version there's a key on the

3    front of this, do you see that, with the names and -- of the

4    individual depicted in the lineup?

5    A.  Yes, sir.

6    Q.  Is that for your reference only?

7    A.  Yes, it is, sir.

8    Q.  You would not provide that to the person that was

9    looking at the lineup?

10   A.  No, I would not.

11   Q.  Okay.  And so each of these photographs is printed on an

12   individual piece of paper, correct, of six individuals?

13   A.  Yes, sir.

14   Q.  All right.  On June 9th, did you present this

15   photographic lineup in Government's Exhibit 1 to an

16   individual that had been shot and had his car stolen from

17   him?

18   A.  Yes, I did, sir.

19   Q.  And that incident -- do you recall the date of the

20   incident when his car was stolen and he was shot in relation

21   to when you showed the lineup?

22   A.  Yes, sir.

23   Q.  What was that?

24   A.  June 5th.

25   Q.  It was -- what happened on June 5th, just to be clear?

1    A.  That was when the victim was carjacked and shot.

2    Q.  So four days later you showed the lineup?

3    A.  Yes, sir.

4    Q.  Now, how did you have the lineup, while it was in your

5    custody, how did you have it arranged?

6    A.  I placed each photo in a separate manila folder and that

7    is how I brought the photos to the victim's location.

8    Q.  Okay.  And then you met with the victim; correct?

9    A.  Yes, sir.

10   Q.  And before you displayed the photographs, did you give

11   the victim any kind of advisory or something like that?

12   A.  Yes, sir.  I read a preamble to the victim before

13   showing him the photos.

14   Q.  Okay.  And is it a preamble that's prepared and used

15   regularly with a lineup?

16   A.  Yes, sir.

17   Q.  And did you include that in your report that was written

18   near or at the time you performed this -- this act?

19   A.  Yes, sir.

20   Q.  All right.  Now, do you remember it verbatim as you sit

21   there now?

22   A.  No, I do not, sir.

23   Q.  But it's recorded in your report at a time when your

24   recollection was clear that you had given that advisory?

25   A.  Yes, sir.

1   Q.  And you have recorded the words that you gave exactly?

2   A.  Yes, sir.

3   Q.  All right.

4          MR. STEINKAMP:  Your Honor, if I may, I believe

5   this is an example of a recorded recollection and I would

6   like to have the agent be able to read the advisory he gave

7   to the victim, please.

8          THE COURT:  You mean read it to himself?

9          MR. STEINKAMP:  Read it out loud to the Court.

10          MR. MICKO:  That's fine, Your Honor.

11          THE COURT:  All right.  I hear no objection from

12   defense counsel and so he may proceed.

13   BY MR. STEINKAMP:

14   Q.  All right.  Do you have your copy of your report?

15   A.  Yes, I do, sir.

16   Q.  All right.  Would you read the advisory you gave to the

17   victim on June 9th?

18   A.  The advisory says:  "You will be viewing a series of

19   photographs.  The person in this case may or may not be

20   present in these photographs.  Take as much time as you need

21   but only look at one photograph at a time.  Please remember

22   that the photograph may not be current.  Clothing, facial

23   hair, length of hair, et cetera, may have changed.  Each

24   photograph is assigned a number that appears at the bottom

25   of the photo.  If you are able to identify the person,

1    inform me using the number assigned to that photograph."

2    Q.  Okay.  You can put your report away.  Thank you.

3          So in the lineup you prepared, was Mr. Swanson's

4    photograph included?

5    A.  Yes, sir.

6    Q.  What number was Mr. Swanson?

7    A.  Photograph number 3, sir.

8    Q.  Okay.  And the other individuals, similar age, similar

9    background, that kind of thing?

10   A.  Yes, sir.

11   Q.  All wearing orange, very similar -- there's a number of

12   similarities?

13   A.  Yes, sir.

14   Q.  All right.  So how did you present the single photos to

15   the victim in this case?

16   A.  I handed the victim one folder at a time and had him

17   look at the photos, and he would set them down on the

18   ground.  He was sitting on the ground.  And he went one

19   photo at a time and looked at all six.

20   Q.  Okay.  And then at one point did he identify Mr. Swanson

21   as the individual that had robbed him?

22   A.  Yes, sir.

23   Q.  Was that his initial response?

24   A.  Yes, sir.

25   Q.  And then what happened after that?

1   A.  He looked at two photographs.  He had said they looked

2   similar and he said his memory was foggy.  And then he

3   looked at them and he choose number 3.  As I was taking the

4   folders back from him, he asked if he could recheck them and

5   he looked over the photographs again.

6   Q.  Okay.  And at that time what happened?

7   A.  He once again looked at all six photographs.  He held

8   number 2 and number 3 in his hands and looked back and

9   forth.  And he said he was 90 percent positive that it was

10  photograph number 2 that was the person that assaulted him.

11  Q.  Which was not Mr. Swanson?

12  A.  Which was not Mr. Swanson.

13          MR. STEINKAMP:  No further questions.

14          THE COURT:  Thank you.

15          Cross-examination, Mr. Micko?

16                    **CROSS-EXAMINATION**

17  BY MR. MICKO:

18  Q.  Special Agent Edlund, Mr. Steinkamp asked you about or

19  mentioned something about a recorded recollection and

20  referred you to your report.  Do you remember that?

21  A.  Yes, sir.

22  Q.  Okay.  In discussing recordings generally, there's no

23  audio or video recording of this encounter that you had with

24  the victim, is there?

25  A.  No, sir.

1    Q.  Okay.  So the only -- the only evidence we have of it is

2    your report and your recollection; right?

3    A.  Yes, sir.

4    Q.  Okay.  You indicated that you had been assisting on this

5    case Special Agent Langert; right?

6    A.  Yes, sir.

7    Q.  And that preceded being a part of this photographic

8    lineup, didn't it?

9    A.  Can you explain the question, sir?

10   Q.  Did you know that -- let me ask it this way.  Did you

11   know that Mr. Swanson was the suspect of this carjacking

12   incident?

13   A.  Yes, I did, sir.

14   Q.  And you knew that before you undertook this photographic

15   lineup with the -- with the victim; right?

16   A.  Yes, sir.

17   Q.  Okay.  So are you -- I take it from your training and

18   experience you're familiar with terms like a "blind" or a

19   "double blind" lineup, things like that?

20   A.  I am not familiar with those, sir.

21   Q.  Okay.  Okay.  But that doesn't matter one way or

22   another, I suppose.  The more important question was I

23   suppose at the time that you conducted this lineup you knew

24   that one of your -- one of the MRAP chosen suspects was the

25   actual suspect; correct?

1    A.  Yes, sir.

2    Q.  Okay.  And that's the case in every one of these

3    lineups, isn't it, that the actual suspect is included?

4    A.  From my understanding, yes, sir.

5    Q.  It would be an intense waste of resources to just go

6    around willy-nilly with people who aren't actual suspects of

7    crimes and ask if the person is in that lineup; right?

8    A.  Yes, sir.

9    Q.  Okay.  And that's not what happened here.  Mr. Swanson

10   is in this lineup; right?

11   A.  That is correct, sir.

12   Q.  Okay.  When you -- how did you go about contacting the

13   victim in this case and discussing the idea of going through

14   a lineup?

15              MR. STEINKAMP:  I object, Your Honor.  It's beyond

16   the scope of direct.  It's not relevant to the issues.  This

17   is discovery.

18              MR. MICKO:  Your Honor, if I may, the issue is

19   whether or not the lineup was suggestive and of course what

20   this witness had to say prior to administering the lineup is

21   important, particularly when he knows who the witness is.

22              MR. STEINKAMP:  May I respond briefly?

23              THE COURT:  You may.

24              MR. STEINKAMP:  This can't possibly be relevant

25   because the defendant was not picked as the individual who

1    committed the robbery.  Ultimately, a different person was

2    picked so it can't possibly be relevant to a

3    misidentification.  The defendant wasn't picked.

4              THE COURT:  Mr. Micko.

5              MR. MICKO:  Your Honor, and what I would say to

6    that is what Mr. Steinkamp is talking about is a standing

7    issue that he identified in his motion to limit the scope of

8    this evidentiary hearing.  The fact is, is Mr. Steinkamp

9    said I'm not going to be putting any of this evidence on in

10   my case-in-chief.  That would of course moot my motion.

11   That's not what Mr. Steinkamp said.  He said, you know,

12   there might be testimony that comes out that it was brought

13   down to two suspects and Mr. Swanson being one of them.

14   That puts this squarely in the crosshairs of what ought to

15   be a motion to suppress.

16             THE COURT:  And repeat your question that you --

17   maybe if we could get the court reporter to repeat that.

18             (The court reporter read the following question:

19   Q.  Okay.  When you -- how did you go about contacting the

20   victim in this case and discussing the idea of going through

21   a lineup?)

22             THE COURT:  I am going to sustain the objection as

23   to that question because I think it asks for too much.  And

24   so if you have another question, we'll consider it.

25             Before you answer, Special Agent, will permit

1    objections here.

2              MR. MICKO:  Thank you, Your Honor.

3    BY MR. MICKO:

4    Q.  Special Agent Edlund, did you contact the victim

5    regarding the idea of going through the lineup?

6    A.  I knocked on his door.

7              MR. STEINKAMP:  I'm going to object.  That

8    question is vague.  The idea of going through the lineup.

9    How about just did you contact him to arrange a time,

10   something like that.  That's what I'm looking for.

11             THE COURT:  Well, be very precise, counsel, in

12   your questions.

13             MR. MICKO:  Sure, Your Honor.

14             THE COURT:  And maybe just focus on sort of what

15   did you do to -- rather than sort of the ideas behind it.

16             MR. MICKO:  Thank you, Your Honor.

17   BY MR. MICKO:

18   Q.  And did the victim know you were coming?

19   A.  No, the victim did not know.  We were unable to contact

20   via telephone.

21   Q.  Okay.  And when you knocked on the door, the victim was

22   home; right?

23   A.  The victim was home, correct, sir.

24   Q.  Okay.  And you had a discussion with the victim about

25   going through a photo lineup?

```
 1     A.  Yes, sir.

 2     Q.  Okay.  Did you -- what did you say to the victim?

 3     A.  The victim and his spouse were home.

 4              MR. STEINKAMP:  Objection.  That's nonresponsive.

 5     And also I think this is again irrelevant to the issue

 6     before the Court.

 7              THE COURT:  Well, I don't know that any coverage

 8     of this is irrelevant.  I think what we have to do is be

 9     very careful with the question, and I'll ask the witness to

10     listen to the question and wait for any objection, and then

11     answer the question.

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  If it's not -- if an objection isn't

14     sustained.  So we'll just have to take this.  And I'll

15     caution counsel just to tread carefully here and stay

16     focused on what you believe you can stand behind on the

17     grounds of relevance here in light of what's before the

18     Court.

19              MR. MICKO:  Yes, Your Honor.  Thank you.

20     BY MR. MICKO:

21     Q.  Agent Edlund, what -- the question was:  What did you

22     say to the victim?

23              MR. STEINKAMP:  Objection.  That's too vague.

24     When he's already talked about statements he made to the

25     victim, we need to break it -- it has to be a little bit
```

1    more clear.  Thank you.

2              MR. MICKO:  Your Honor, if I may.  This was a

3    follow-up question asking what Agent Edlund said after he

4    knocked on the door and the victim and his wife answered.

5    That's appropriate sequencing.

6              THE COURT:  I will overrule the objection.  And I

7    think just the spacing of time, but with that clarification

8    the witness can answer that question.  What did you say?

9              THE WITNESS:  I asked if the victim was willing to

10   look at a photo lineup and to see if the victim was able to

11   identify a subject or not.

12   BY MR. MICKO:

13   Q.  And did you have any other conversation with the victim

14   before reading your -- the preamble that you read earlier

15   today?

16   A.  No, sir.

17   Q.  Okay.  After that you read the preamble?

18   A.  Yes, I did, sir.

19   Q.  Okay.  Now, did the victim have any questions for you

20   before reading the preamble?

21   A.  Not that I recall, sir.

22   Q.  Okay.  And you said he sat down on the ground?

23   A.  Yes, sir.

24   Q.  Were you outside?

25   A.  We were inside their residence, sir.

```
1     Q.  And he sat on the ground in his residence?

2     A.  He did, sir.

3     Q.  Okay.  Getting back to the selection of the pictures

4     here, you indicated that there's kind of a computer-

5     generated process; is that right?

6     A.  Yes, sir.

7     Q.  Do you have any discretion in changing the lineup that

8     is spit out by the computer?

9     A.  I am not aware of having any discretion.

10    Q.  Okay.  And was it you who went through the process of

11    coming up with the parameters that resulted in this lineup?

12            MR. STEINKAMP:  I got to object, Your Honor.  If I

13    may, can I state the reason for my objection?

14            THE COURT:  You may state the reason for your

15    objection.

16            MR. STEINKAMP:  There is no claim that this lineup

17    is overly suggestive in its makeup.  There is nothing in the

18    motion that says that.  And now we're into a large

19    discussion about the makeup of the lineup.  And this is the

20    problem that the Government has when this broad motion is

21    made.  Now almost anything related to the lineup becomes, in

22    the defense's argument, relevant.  But there's no objection

23    to the lineup or its makeup, and so why do we need to have

24    this kind of discussion?

25            And I submit that it is to obtain information from
```

1    this witness at this hearing in order to use it at a later

2    time.  That's all I'll suggest.

3              THE COURT:  Mr. Micko, would you like to respond?

4              MR. MICKO:  I'm happy to respond if the Court

5    seeks a response.  Otherwise, the motion to suppress was

6    based on the lineup being unduly suggestive.  That --

7    there's only so many ways that a lineup can be suppressed.

8    Either it's unduly suggestive in terms of its composition or

9    it's unduly suggestive in how it's administered.  I'm not

10   sure that we're off course here.

11             THE COURT:  I don't see us being off course but I

12   will carefully listen to the questions and again ask the

13   witness to pause before answering, but I will overrule the

14   objection on this question.

15             MR. MICKO:  I bet you don't remember my question.

16             THE WITNESS:  Could you repeat it, sir?

17             MR. MICKO:  I will try.  I'll rephrase it in a way

18   that could be easy to answer.

19   BY MR. MICKO:

20   Q.  Is there anything you did to -- any steps that you did

21   to change the composition of a lineup for Mr. Swanson once

22   this was spit out by the computer, the MRAP computer?

23   A.  No, sir.

24   Q.  Okay.  So it was a one-time thing?

25   A.  Yes, sir.

1   Q.  Okay.  When the victim indicated that he had narrowed it

2   down to two photographs, what did you do?

3   A.  I gave the victim time to look at them until the victim

4   provided a response to me.

5   Q.  And when you say you gave the victim time, was the

6   victim holding both photographs at the same time?

7   A.  As I recall, yes, sir.

8   Q.  Okay.  And once the victim indicated that he had

9   selected photograph number 2 with 90 percent certainty, what

10  did you do?

11  A.  Once he did that, I asked him to turn the page over and

12  to initial and date it, which he did, and then I collected

13  the photos and the folders, sir.

14          MR. MICKO:  I have no further questions, Your

15  Honor.

16          THE COURT:  Thank you.

17          Mr. Steinkamp, any redirect?

18          MR. STEINKAMP:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  Thank you.  You can step

20  down.  Thank you.  And if you could just please take off

21  that little sleeve and throw it away, and you caught it.

22  You got the actual microphone covering in there.

23          THE WITNESS:  I did.

24          THE COURT:  Thank you.

25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  I believe we have one more witness.

2          MR. STEINKAMP:  Yes, Your Honor.  It will be very

3    brief, yes.  I call Special Agent Chris Langert.

4          THE COURT:  All right.  Special Agent, you know

5    the routine.  If you could step up to the box.  Put the

6    sleeve cover on.

7          And then if you could please remain standing,

8    raise your right hand.

9          Do you swear in the testimony you're about to give

10   to tell the truth, the whole truth, and nothing but the

11   truth?

12         MR. LANGERT:  Yes, I do.

13         THE COURT:  Thank you.  Please be seated, and get

14   up right next to the microphone.  State your full name,

15   first and last, and spell it for the court reporter.

16         THE WITNESS:  Christopher Langert, L-A-N-G-E-R-T.

17         THE COURT:  Thank you.

18         Counsel, you may proceed.

19         MR. STEINKAMP:  Thank you, Your Honor.

20                    **(CHRISTOPHER LANGERT)**

21                     **DIRECT EXAMINATION**

22   BY MR. STEINKAMP:

23   Q.  Mr. Langert, you're employed at the FBI; correct?

24   A.  Yes, I am.

25   Q.  You're a special agent?

```
 1    A.  I am.

 2    Q.  How long have you been a Special Agent?

 3    A.  Twenty-four years.

 4    Q.  Okay.  And what's your current assignment?

 5    A.  I'm assigned to the Violent Crime Squad.

 6    Q.  And does the Violent Crime Squad work with local

 7    agencies in Minnesota to assist them in investigating

 8    violent crime?

 9    A.  Yes, we do.

10    Q.  And you work sometimes on carjacking cases?

11    A.  Yes, I do.

12    Q.  Were you aware on June 7th of an investigation involving

13    Mr. Swanson as a potential suspect in a carjacking?

14    A.  Yes, I was.

15    Q.  And was there an ongoing investigation with the Federal

16    Bureau of Investigation and the Minneapolis Police

17    Department about the carjacking which occurred in

18    Minneapolis on that day?

19    A.  I began -- I received information on June 7th.

20    Q.  My question was:  Was there an ongoing investigation on

21    that day with you and Minneapolis?

22    A.  My investigation began that day.

23    Q.  Yes.

24    A.  The Minneapolis Police Department had been investigating

25    that carjacking since the evening of June 5th.
```

1    Q.  Okay.  Which is the day it happened; correct?

2    A.  That is the day that it occurred, yes.

3    Q.  All right.  Now, you became aware through your review of

4    the investigation that the Wright County Sheriff's Office

5    had arrested Mr. Swanson on June 7th; correct?

6    A.  Yes, I reviewed their reports and the video from their

7    squad cars.

8    Q.  All right.  My question to you is a very simple one.

9    You realized -- you understood there was a gun found in a

10   backpack?

11   A.  I did understand that.

12   Q.  And did you have information regarding what a witness

13   had said on the scene before the gun was found?

14   A.  Yes.  I was reading the reports and reviewing the video,

15   and by this time I had actually done an interview.  David

16   Heil said, "There is a gun in that backpack."

17   Q.  So my question is a hypothetical.  Had a gun not been

18   recovered out of the backpack that Heil said it was in, in

19   your ongoing investigation would you have obtained a search

20   warrant to try to locate the gun?

21   A.  Yes, I would have used -- I would have obtained a search

22   warrant myself through the federal system or with my local

23   partners.

24           MR. STEINKAMP:  Thank you.  No further questions,

25   Your Honor.

1          THE COURT:  Thank you.

2          Cross-examination, Mr. Micko?

3                     **CROSS-EXAMINATION**

4     BY MR. MICKO:

5     Q.  Special Agent Langert, you agree with me that that

6     hypothetical assumes that the backpack was either within

7     police custody or somewhere the police could find it; right?

8     A.  Absolutely.

9     Q.  Okay.  And you don't know for sure that that would have

10    been the case under a hypothetical situation, do you?

11    A.  That what would have been the case?  That the police

12    could not have found the backpack that Mr. Heil pointed to

13    and said there's a gun in it?

14    Q.  Yes.

15    A.  I believe -- I believe it would be possible for the

16    police to find that backpack, yes, I do.

17    Q.  Okay.  You also indicated you interviewed Mr. Heil?

18    A.  I did conduct an interview of Mr. Heil.

19    Q.  Okay.  And you produced an FBI 302 for that interview?

20    A.  I did produce an FBI 302 for that interview.

21          MR. MICKO:  Okay.  I have no further questions.

22          THE COURT:  Any redirect?

23          MR. STEINKAMP:  No, Your Honor.

24          THE COURT:  All right.  Thank you.  You may step

25    down.  Thank you for pulling the sleeve off of the

1    microphone.  Looks like we need to glue that on.

2         All right.  Well, why don't we talk about

3    briefing.  Let me ask, is there any further evidence that

4    the Government wishes to present?

5         MR. STEINKAMP:  No, Your Honor.  On the issue that

6    is before the Court, the Government rests at this time.

7         THE COURT:  Thank you.  And Mr. Micko, is there

8    any evidence other than the cross-examination that you'd

9    like to introduce on behalf of the defendant?

10        MR. MICKO:  No, Your Honor.  Thank you.

11        THE COURT:  All right.  Very good.  Well, let's

12   talk about briefing dates.  I'll let the court reporter tell

13   me if a request comes in on Monday, how long it will take

14   her to turn around a transcript.

15        THE COURT REPORTER:  Fourteen days.

16        THE COURT:  And with that, the magic of the

17   calculation that is about 10 feet away from me, my law clerk

18   has provided a date for the Defendant's brief of March 25th.

19   Would that work, Mr. Micko?

20        MR. MICKO:  Yes, Your Honor.  Thank you.

21        THE COURT:  And then for the Government, April

22   8th, two weeks after that.  Would that work for the

23   Government?

24        MR. STEINKAMP:  Yes, Your Honor.  Thank you.

25        THE COURT:  Good.  And then I've got all the

 1    exhibits.  I will expect to get the new USB with the audio.

 2              MR. STEINKAMP:  Um-hum, yes.

 3              THE COURT:  So that will be available to the

 4    Court.

 5              And is there anything further that we should

 6    discuss?  Let me start with the -- Mr. Micko.

 7              MR. MICKO:  No, Your Honor.  Thank you.

 8              THE COURT:  Mr. Steinkamp?

 9              MR. STEINKAMP:  No.  Thank you, Your Honor.

10              THE COURT:  Thank you.  And thank you everyone for

11    getting the exhibits, and I know we had a little difficulty

12    with the audio but I could hear it as we went along so I

13    hope everyone could, too.

14              And Mr. Swanson, thank you for, you know, helping

15    with making sure that you had the right site lines here.

16              THE DEFENDANT:  Thank you for your time, Your

17    Honor.

18              THE COURT:  Thank you very much.  We are in

19    recess.

20              (Court adjourned at 3:09 p.m.)

21

22

23

24

25

1                          *       *       *

2

3

4           I, Carla R. Bebault, certify that the foregoing is

5      a correct transcript from the record of proceedings in the

6      above-entitled matter.

7

8           Certified by:   s/Carla R. Bebault

9                           Carla Bebault, RMR, CRR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

PAGE

**MATTHEW MOSIMAN**
   Direct Examination By Mr. Steinkamp              20
   Cross-Examination By Mr. Micko                   56
   Redirect Examination By Mr. Steinkamp            67
   Recross-Examination By Mr. Micko                 68

**ANDREW EMANUEL**
   Direct Examination By Mr. Steinkamp              71
   Cross-Examination By Mr. Micko                   79
   Redirect Examination By Mr. Steinkamp            86

**CHAD EDLUND**
   Direct Examination By Mr. Steinkamp              89
   Cross-Examination By Mr. Micko                   96

**CHRISTOPHER LANGERT**
   Direct Examination By Mr. Steinkamp             106
   Cross-Examination By Mr. Micko                  109




<u>GOVERNMENT EXHIBITS</u>                            <u>REC'D</u>
   1                                                17
   2                                                17
   3                                                17
   4                                                17